**Robyn DOUGLASS,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**HUSTLER MAGAZINE, INC.,**
**Defendant-Appellant-Cross-Appellee,**

**and**

**Augustin Gregory, Defendant.**

**Nos. 84–2919, 84–2985.**

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1985.

Decided June 17, 1985.

Rehearing and Rehearing En Banc Denied Aug. 22, 1985.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

William D. Serpico, Serpico, Novelle, Dvorak & Navigato, Ltd., Chicago, Ill., for plaintiff-appellee-cross-appellant.

Glen H. Kanwit, Hopkins & Sutter, Chicago, Ill., for defendant Hustler Magazine, Inc.

Before ESCHBACH and POSNER, Circuit Judges, and TIMBERS, Senior Circuit Judge.*

POSNER, Circuit Judge.

Robyn Douglass, the actress and model, obtained $600,000 in damages in this diversity suit against the corporation that publishes *Hustler* magazine, for invasion of her right of privacy. 607 F.Supp. 816. *Hustler* (as we shall call the magazine and its publisher interchangeably) has appealed, raising questions of tort law, freedom of the press, and trial procedure; Douglass has cross-appealed, complaining about the judge's action in reducing the punitive damages awarded by the jury.

Robyn Douglass moved to Chicago in 1974 and began a career as an actress and model. That year she posed nude together with another woman for the freelance photographer Augustin Gregory, a codefendant with *Hustler* in the district court. The photographs were intended for a forthcoming feature in *Playboy* magazine, the "Ripped-Off" pictorial. Gregory testified that he required all his photographic models to sign releases allowing him to do with the photographs whatever he wanted. Robyn Douglass testified (and the jury was entitled to believe) that all she signed was a release authorizing *Playboy* to publish or otherwise use the photographs "for any lawful purpose whatsoever, without restrictions." The release does not refer to sale as such; but in granting rights not only to *Playboy* but to its "assigns and licensees," Douglass in effect gave *Playboy* carte blanche to dispose of the photos in any lawful way it wanted. Some of the photographs were published in *Playboy* in March 1975 as planned. Gregory had in 1974 also taken nude photographs of Douglass for a "Water and Sex" pictorial, also intended for *Playboy*; and there is a similar conflict over the release.

Douglass's career throve in the following years. She appeared eight times nude in *Playboy* but also made television commercials for Chicago advertising agencies and appeared in television dramas and in movies—notably "Breaking Away," where she had a starring role. Meanwhile in 1980 Gregory had become the photography edi-

* Hon. William H. Timbers of the Second Circuit, sitting by designation.

tor of *Hustler*. This move was not unconnected with his earlier photographing of Douglass. The magazine wanted to publish nude photos of celebrities and in negotiations over becoming *Hustler's* photography editor Gregory had shown management some of his photographs of Douglass. After he was hired, management asked Gregory for releases authorizing publication of these photographs. He testified that he couldn't find the releases at first but that eventually he submitted to *Hustler* two releases signed by Douglass, one for the photo session for the "Ripped-Off" pictorial, the other for the "Water and Sex" pictorial. At trial *Hustler* was able to produce only photostats of the releases allegedly signed by Douglass. The parties stipulated that, if called as a witness, a handwriting expert would testify that Douglass's signature had been forged on one of the releases and that the photostat of the other was too poor to allow the authenticity of the signature on it to be determined.

Douglass heard that there was to be a photo feature on her in the January 1981 issue of *Hustler* (an acquaintance had seen an announcement of it in a previous issue). She complained to the magazine that it had no authority to publish any photos of her. It responded with photostatic copies of the alleged releases, which within two or three days she denounced to *Hustler* as forgeries. The issue containing the feature had already been printed and distributed to retailers; and though it had not yet appeared on newsstands or been mailed to subscribers, *Hustler* made no effort to recall the issue, and it was widely sold. The feature, entitled "Robyn Douglass Nude," contained nude photographs from the two photo sessions for *Playboy* and stills (not nude) from two of her movies. The magazine paid Gregory a fee, over and above his regular salary, for the photographs he had supplied.

This suit charges that Gregory and *Hustler* invaded Douglass's right to privacy under the common law of Illinois by publishing "Robyn Douglass Nude." The feature, she charged, invaded her right of privacy in two ways: it cast her in a "false light," and

it appropriated valuable commercial rights that belong to her. At trial she presented evidence that the publication of the feature had caused her emotional distress, and had killed her career of making commercials in Chicago because advertisers thought she had voluntarily appeared in what they considered an extremely vulgar magazine. An economist testified that the present value of her lost earnings was $716,565 at the time of trial (1983).

The judge gave the jury a verdict form with a blank beside each defendant's name for the amount of compensatory damages if the jury found either defendant liable, and a separate blank beside each name for punitive damages. The jury found both defendants liable and awarded the plaintiff $500,000 in compensatory damages against each defendant and $1,500,000 in punitive damages against *Hustler*. The judge remitted all but $100,000 of the punitive damages and Douglass accepted the remittitur. The award of compensatory damages against Gregory was not executed because on the eve of trial he had made an agreement with Douglass that if he testified truthfully, and consistently with his deposition, she would not execute any judgment against him. Hence the real judgment was only $600,000. Gregory has not filed an appearance in this court.

*Hustler* argues that the facts, even when viewed favorably to the plaintiff, do not make out a cause of action under the Illinois common law of privacy, so that the judgment should be reversed with directions to dismiss the complaint; or that if they do, still the complaint must be dismissed because the plaintiff failed to prove "actual malice" by clear and convincing evidence, as required by the Constitution. Alternatively it argues that a new trial should be ordered because of errors in the instructions to the jury, and other trial errors.

First of all, *Hustler* denies that Illinois even recognizes the "false light" tort. Illinois' substantive law governs this suit, apart from the defendants' First Amend-

ment defense; and no Illinois court has ever found liability for such a tort, and one case states "that in Illinois actions for invasions of privacy are limited to use of an individual's name or likeness for commercial purposes." *Kelly v. Franco*, 72 Ill. App.3d 642, 646, 28 Ill.Dec. 855, 858–59, 391 N.E.2d 54, 57–58 (1979). But the statement was dictum. The plaintiff in *Kelly* was trying to recover damages for pesky phone calls by a neighbor; the case had nothing to do with the false-light tort. In cases in which that tort has been charged, albeit unsuccessfully, the Illinois courts have proceeded as if it existed in Illinois. In *Leopold v. Levin*, 45 Ill.2d 434, 259 N.E.2d 250 (1970), the only false-light case decided by the Illinois Supreme Court, Leopold, the surviving defendant in the Leopold and Loeb murder case, brought suit against the author of a book about the case, charging that the book (*Compulsion*) placed Leopold in a false light. The Illinois Supreme Court held that Leopold had no cause of action. He had forfeited any right of privacy by the notoriety of his crime; the book was represented to the public as a fictionalized rather than literal account; Leopold was a public figure; and to award tort damages would have unduly limited freedom of expression. These points would have been unnecessary to make if the court had thought that the false-light tort was not part of the common law of Illinois. *Adreani v. Hansen*, 80 Ill.App.3d 726, 730, 400 N.E.2d 679, 682–83 (1980), is a comparable case, while *Midwest Glass Co. v. Stanford Development Co.*, 34 Ill. App.3d 130, 133, 339 N.E.2d 274, 277 (1975), and *Cantrell v. American Broadcasting Cos.*, 529 F.Supp. 746, 756–59 (N.D. Ill.1981), explicitly recognize the existence of the false-light tort in Illinois, though *Midwest Glass* does so only in dictum and *Cantrell* is not a state-court case. Incidentally, we do not read *Leopold v. Levin* to deny the protection of the tort to any and all public figures (Robyn Douglass, as we shall see, is a public figure). Leopold's status as a public figure was relevant to but not, as we read the opinion, conclusive on whether his rights had been violated.

Like every other division of the tort law of privacy, the "false light" tort (on which see the compendious summary in the Second Restatement of Torts § 652E, at pp. 394–400 (1977)) can be criticized, especially for overlapping with the tort of defamation. See, e.g., *Renwick v. News & Observer Publishing Co.*, 310 N.C. 312, 312 S.E.2d 405 (1984); Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?*, 31 Law & Contemp.Prob. 326, 339–41 (1966); Prosser, *Privacy*, 48 Calif.L. Rev. 383, 400–01 (1960). Why should a plaintiff be able to circumvent the technical limitations with which the tort of defamation is hedged about by calling his suit one for placing him in a false light? Several answers are possible, however:

1. Some of those limitations seem not to reflect considered policy, but instead to be fossil remnants of the tort's prehistory in the discredited practices of Star Chamber and the discredited concept of seditious libel. See, e.g., Prosser and Keeton on the Law of Torts § 111, at pp. 771–72 (5th ed. 1984). If they are gotten around by allowing a plaintiff to plead invasion of privacy, there is no great loss.

2. The principal limitations concern the requirement of proving special damages in some cases. See, e.g., *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 267 (7th Cir.1983). Since Robyn Douglass proved special damages (i.e., a pecuniary loss), these limitations would not have impeded her even if she had brought this suit as one for defamation. As for the other limitations in the law of defamation, *Hustler* has not shown how any of them, either, would have posed an embarrassment for Douglass on the facts of this case. And if she had sued for defamation she would not have had to prove (though it was not difficult to prove) that the offending materials had been widely publicized, an element of invasion of privacy that has no counterpart in the law of defamation.

3. Part of Douglass's claim is that *Hustler* insinuated that she is a lesbian; and such a claim could of course be the basis for an action for defamation. But

the rest of her claim fits more comfortably into the category of offensive rather than defamatory publicity. The difference is illustrated by *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). *Life* magazine had presented as true a fictionalized account of the ordeal of a family held hostage by escaped convicts. The members of the family were shown being subjected to various indignities that had not actually occurred. The article did not defame the family members in the sense of accusing them of immoral, improper, or other bad conduct, and yet many people would be upset to think that the whole world thought them victims of such mistreatment. The false-light tort, to the extent distinct from the tort of defamation (but there is indeed considerable overlap), rests on an awareness that people who are made to seem pathetic or ridiculous may be shunned, and not just people who are thought to be dishonest or incompetent or immoral. We grant, though, that the distinction is blurred by the fact that a false statement that a woman was raped is actionable as defamation, see, e.g., *Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd.*, 50 Times L.Rep. 581, 584 (C.A.1934), though in such a case the plaintiff is represented to be a victim of wrongdoing rather than a wrongdoer herself.

At all events, the criticisms of the false-light tort have to our knowledge persuaded the courts of only one state that recognizes a tort of invasion of privacy to withhold recognition of this subtype of the tort—North Carolina, in the *Renwick* case cited earlier. Almost all signs point to Illinois' recognizing it when a suitable case arises. A more difficult question is whether the facts of this case make out a false-light tort. We must decide in what light *Hustler* may be said to have cast Robyn Douglass, and (by comparison with her activities as a *Playboy* model) in what if any sense the light could have been found to be a false one. To answer these questions we shall have to enter imaginatively into a world that is not the natural habitat of judges—the world of nude modeling and (as they are called in the trade) "provocative" magazines.

The feature "Robyn Douglass Nude" in the January 1981 issue of *Hustler* occupies three full pages about a third of the way from the end of the magazine. The first page is dominated by a picture of Douglass, shown from the front, rain-splattered, wearing only an open raincoat. This is one of the photos that had been taken for the "Water and Sex" pictorial. Her mouth is open and her eyes closed. The text on the page reads:

> She played Katherine, the Midwestern coed in the film *Breaking Away*, and Jamie, the shapely newspaper reporter in the TV series *Galactica 1980* (below). But in HUSTLER seductive young actress Robyn Douglass plays herself. In these never-before-published photos this hot new star strips away her screen image to reveal the flesh of a real woman. An accomplished stage performer and TV-commercial model (Orbit gum, Gatorade and United Airlines), Robyn has been trained to use her body as a tool of her trade. These photos show just how well she's learned to use that tool.

The "below" reference is to an innocuous still photo from the television series.

The second page of the feature is given over to four more photographs of Douglass, two from "Water and Sex" and two from the "Ripped-Off" pictorial. (To be precise, these and the other nude photos in "Robyn Douglass Nude" were photos that had been taken for the two *Playboy* pictorials but, apparently, had not actually been published.) The photographs from "Water and Sex" again show Douglass from the front with the raincoat playing out behind her. In one picture her mouth is open while in the other she seems to be looking abstractedly at herself. In the two photos from "Ripped-Off," Douglass, now wearing a slip rather than a raincoat, appears to be engaged in erotic play with the other woman in the pictorial.

The last page of the feature has the following text beneath a picture of Douglass, fully clothed, on a motorcycle:

When asked to audition for the role of Katherine in *Breaking Away* (above), Robyn sought out the character's most emotional scene to read for director Peter Yates. "You only have a short time to prepare; so I went through the script to try to find the climactic moments for Katherine." From the looks of Robyn (who's blond in the photos of her and a female friend), she's never had difficulty finding climactic moments.

The rest of the page is given over to two photographs from the "Ripped-Off" pictorial. The underwear visible in the other two photographs from this session has indeed been ripped off; the two women are naked. Douglass is straddling the other woman and the two appear to be engaged in sexual activity.

Douglass argues that the *Hustler* feature casts her in a false light in two respects. First, it insinuates that she is a lesbian, which (all agree) she is not. Second, it insinuates that she is the kind of person willing to be shown naked in *Hustler*. Nothing in the feature itself suggests that the nude photographs of her are appearing without her permission and against her will, and readers might well assume that she had cooperated in the preparation of the feature in order to stimulate interest in her films. Moreover, she had been described in a previous issue of *Hustler* as a forthcoming "Hustler celebrity-exclusive," and in another issue *Hustler*'s chairman, Larry Flynt, had announced in an editorial column that he does not publish photographs of women without their consent. It is (or so a jury could find) as if *Hustler* had said, "Robyn Douglass is proud to pose nude for *Hustler* magazine." To complete this part of her argument Douglass asserts that voluntary association with *Hustler* as a nude model is degrading.

We would not ourselves think that *Hustler* was seriously insinuating—or that its readership would think—that Robyn Douglass is a lesbian. *Hustler* is a magazine for men. Few men are interested in lesbians. The purpose of showing two women in apparent sexual embrace is to display the charms of two women. Moreover, the photos obviously are posed rather than candid shots; they show what the photographer wanted the women to do, not necessarily what the women wanted to do. Nevertheless we cannot say that a reasonable jury seeing the pictures and reading the accompanying text with its references to "climactic moments" and "female friend" could not infer that Douglass was being represented to be a lesbian.

The question whether she was also being depicted in a degrading association with *Hustler* invites attention to the difference between libel and false light. It would have been difficult for Douglass to state this claim as one for libel. For what exactly is the imputation of saying (or here, implying) of a person that she agreed to have pictures of herself appear in a vulgar and offensive magazine? That she is immoral? This would be too strong a characterization in today's moral climate. That she lacks good taste? This would not be defamatory. See Prosser and Keeton on the Law of Torts, *supra*, § 111, at pp. 773–78. The point is, rather, that to be shown nude in such a setting before millions of people—the readers of the magazine—is degrading in much the same way that to be shown beaten up by criminals is degrading (although not libelous, despite the analogy to being reported to have been raped), though of course if Douglass consented to appear nude in this setting she is responsible for her own debasement and can get no judicial redress.

That the setting is indeed a degrading one requires only a glance through the issue of *Hustler* in which "Robyn Douglass Nude" was published to confirm. The cover shows a naked woman straddling and embracing a giant peppermint stick. The titles of several articles in the issue are printed on the cover, next to the picture, including along with some titles that are not related to sex "New Discovery: How to Give Women Vaginal Orgasms." This is directly below "Nude Celebrity: Robyn Douglass, Star of Galactica and Breaking Away." The inside cover is a full page of

advertisements for pornographic video cassettes. On page 5 there is the "publisher's [Larry Flynt's] statement"—a call to tax the churches. This sounds another theme of Hustler: "irreverence," which has the practical meaning in *Hustler* of hostility to or contempt for racial, ethnic, and religious minorities. Then there is a "World News Roundup"—the news is all concerned with sex—and a page of coarse advice to readers who have sexual problems. Between these two features is a full-page advertisement entitled "Get Any Girl *Within 5 Minutes* or YOU PAY NOTHING!" with subtitles such as "Turn Women Into Putty." The issue contains many similar sexual advertisements, some with obscene pictures and text. The reader arrives next at a regular monthly feature, "Asshole of the Month," in which a man's head—in this issue the head of a professor at the Harvard Law School, who in January 1981 was in charge of the criminal division of the Justice Department—is shown protruding from the rear of a donkey. The next few pages consist of vulgar photographs, some from pornographic movies, plus jokes and cartoons many of which are racially offensive; all are offensive in one way or another. In one cartoon, a doctor in an abortion clinic is feeding a foetus to a rat in an alley. Then there is an illustrated feature on pornographic movies, followed by four book reviews (two of erotic works) and "How to Achieve Vaginal Orgasms." The magazine sobers up a little with a symposium on gun control, punctuated however by tasteless cartoons such as one in which a black child says to Santa Claus, "I'd like a new little brother for Christmas. We could use the extra welfare check!" The symposium is followed by a nude pictorial, by more tasteless cartoons, and by a mock advertisement for a "Starving Cambodian Baby Doll."

We shall leave off here, on page 51 of a 136-page issue, having sufficiently indicated the character of the magazine. To be depicted as *voluntarily* associated with such a sheet (the Harvard law professor's association is not represented as voluntary) is unquestionably degrading to a normal person, especially if the depiction is erotic (the depiction of the professor is not); for although the magazine is offensive on several planes, the sexual is the one most emphasized. These features of the case help to distinguish *Ann-Margret v. High Society Magazine, Inc.*, 498 F.Supp. 401, 404–06 (S.D.N.Y.1980), where a semi-nude still of an actress was published without her authorization in a magazine (*High Society Celebrity Skin*) described by the judge merely as "tacky," 498 F.Supp. at 404; *McCabe v. Village Voice, Inc.*, 550 F.Supp. 525, 529 (E.D.Pa.1982), a case like *Ann-Margret* except that the magazine was completely inoffensive; and *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 530 (9th Cir.1984), where a previously published photograph was republished in a "sexually explicit" magazine—none other than *Hustler* itself—but apparently the plaintiff did not argue that the magazine was degrading, as distinct from merely explicit. And the photograph was of Brewer pretending to shoot himself in the head (for unexplained reasons, he had had this photograph printed on his business cards); he was not associated with the magazine's view of sex. More important, in none of these cases was it argued that the subject was being represented as appearing voluntarily in the magazine, and (except in *McCabe*) the photographs had previously been published elsewhere. These points are related. If a photograph has been published previously the implied representation that its present publication is with the consent of the subject is weakened; the first publication may have put the photograph in the public domain. But the nude photographs of Robyn Douglass that *Hustler* published had not been published before.

*Hustler* argues that publication of "Robyn Douglass Nude" could not be degrading to one who had posed nude for *Playboy*. This fact distinguishes the case from the two cases that give the most support to Douglass's false-light claim: *Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084 (5th Cir.1984), where the plaintiff was not a model or actress and her nude photo (taken

by her husband) had not been published previously and had not been intended to be published; and *Braun v. Flynt,* 726 F.2d 245 (5th Cir.1984), where the photo of the plaintiff that was published on the same page with offensive matter in another "provocative" magazine published by Flynt (*Chic*) was not a nude photo; the plaintiff was wearing a bathing suit. See *id.* at 247–48. (It should be apparent by now that this little niche of the law of privacy is dominated by Larry Flynt's publications.)

To evaluate *Hustler's* contention required the jury to compare the two magazines. We shall use for comparison the issue of *Playboy* in which the "Ripped-Off" pictorial appeared, though the jury had other issues of *Playboy* to peruse as well. The cover shows a young woman with partially naked buttocks and thighs but otherwise clothed. The only (other) suggestion of sex on the cover is the words "Ripped Off! A Torrid Nine-Page Pictorial," which by its position on the cover appears to be a reference to the cover girl. The inside cover is a conventional advertisement for Scotch whisky. Besides advertisements (none sexual), the issue contains fiction, a column of sexual advice (more refined than its *Hustler* counterpart), book reviews (only one of a book on sex), and articles. None of the stories or articles is obscene, though one story is erotic (a "Ribald Classic") and there are many bawdy cartoons and jokes (but not vicious ones, like many of those in *Hustler*) and four nude pictorials. In one of the pictorials a woman is doing exercises and being massaged; some of the frames contain an erotic suggestion of a mild sort. Two of the other pictorials show nude women in various poses but there is no suggestion that they are engaged in erotic activity. The last nude pictorial is "Ripped-Off," which turns out to consist of photographs of nude women (some in erotic poses) by different photographers. Two of the photographs are by Gregory, and one of them is of Robyn Douglass, though she is not identified by name. Although she is shown removing the slip of the other woman, as in the *Hustler* pictures, the text beneath the picture weakens any inference of lesbianism: "How long since you've seen a girl—let alone two—in lingerie like this? 'I pick very feminine, almost outdated slips for the girls to wear in this scene,' says photographer Gregory. 'To me, that made it more of a fantasy, more of a turn-on.'" Among other pictures in "Ripped-Off," one could be taken to be an (obviously simulated) photograph of sexual intercourse.

Although many people find *Playboy,* with its emphasis on sex and nudity, offensive, the differences between it and *Hustler* are palpable. *Playboy,* like *Hustler,* contains nude pictorials, but the erotic theme is generally muted, though there are occasional photographs that an earlier generation would have considered definitely obscene. And unlike *Hustler, Playboy* does not carry sexual advertisements, does not ridicule racial or religious groups, and avoids repulsive photographs—though most of the jokes and cartoons have sex as their theme, and not all are in good taste. We cannot say that it would be irrational for a jury to find that in the highly permissive moral and cultural climate prevailing in late twentieth-century America, posing nude for *Playboy* is consistent with respectability for a model and actress but that posing nude in *Hustler* is not (not yet, anyway), so that to portray Robyn Douglass as voluntarily posing nude for *Hustler* could be thought to place her in a false light even though she had voluntarily posed nude for *Playboy.* Apart from the evidence of the magazines themselves, Douglass presented evidence that advertising agencies in Chicago were afraid of their clients' reactions if she appeared in commercials after her appearance in *Hustler,* but cared nothing about her appearing nude in *Playboy.* And of course the issue for us is not whether the jury was right but whether a reasonable jury could have found a false-light tort on the facts of this case.

However, since Douglass gave a general release to *Playboy,* it can be argued that she consented to have her photographs appear in any lawful setting; and there is no

contention that "Robyn Douglass Nude," or the issue of *Hustler* in which it appeared, could lawfully have been suppressed on obscenity or other grounds. The jury could find, however, that only Douglass or *Playboy* could give consent to the publication of the photographs and that neither had done so. True, by giving *Playboy* a general release Douglass took a risk that her nude photographs would end up in an offensive setting that would damage her career as a model for television commercials, and it might seem that someone who takes such a risk cannot have a high regard for her privacy. But the risk she took and the risk that materialized were not the same. She took what may have seemed a trivial risk that *Playboy* would resell her photographs to a competitor, not the risk that the competitor would steal them. *Playboy* has an interest, on which Douglass could reasonably rely in executing a release to *Playboy*, in not degrading its models and in maintaining exclusive rights to its photos of them. The woman in the *Wood* case assumed the risk that her husband would sell *Hustler* the nude photograph that he took of her, but this did not deprive her of the right to sue for invasion of privacy when *Hustler* published the photograph having gotten it from someone who had broken into her house and stolen it.

We conclude that Robyn Douglass has a cause of action against *Hustler* for portraying her in a false light. Further, we think the jury did not exceed the bounds of reason in finding that *Hustler* also violated her rights under the commercial-appropriation branch of the right of privacy—what is sometimes called the "right of publicity," which *Hustler* concedes is a part of the common law of Illinois. This is the right to prevent others from using one's name or picture for commercial purposes without consent. Although originally the forbidden use was putting one's name or picture into an advertisement, it is apparent from *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), that the right can extend to publication in the nonadvertising portions of a magazine or broadcast. This extension is closely related to copyright. See *id.* at 573, 577, 97 S.Ct. at 2856, 2858; see generally Samuelson, *Reviving Zacchini: Analyzing First Amendment Defenses in Right of Publicity and Copyright Cases*, 57 Tulane L.Rev. 836, 843–54 (1983); Note, *Human Cannonballs and the First Amendment: Zacchini v. Scripps-Howard Broadcasting Co.*, 30 Stan.L.Rev. 1185 (1978). Zacchini had perfected a "human cannonball" act that lasted about 15 seconds. A television station broadcast the whole act as part of a news program. The station argued that the act was newsworthy; in copyright terms this would make the broadcasting of it a "fair use." *Hustler* makes a similar argument here—Robyn Douglass is newsworthy and "Robyn Douglass Nude" was fair comment on her career. But the station could have done a story on Zacchini without showing his entire act; and showing the whole act was likely to shrink the paying audience for it—people could see it on television for nothing. Thus there was an invasion of Zacchini's rights, analogous to copyright, under state tort law. Similarly, Robyn Douglass or her agents must have control over the dissemination of her nude photographs if their value is to be maximized. *Hustler* can run a story on her and use any photographs that are in the public domain or that it can buy but it cannot use photographs made by others for commercial purposes and (temporarily) withheld from public distribution. Cf. *Grant v. Esquire, Inc.*, 367 F.Supp. 876, 880 (S.D.N.Y.1973).

The unauthorized publication did impair the commercial exploitation of Douglass's talents, though probably not as much as she asserts and mainly because of where they were published. But an important aspect of the "right of publicity" is being able to control the place as well as time and number of one's public appearances; for example, no celebrity sells his name or likeness for advertising purposes to all comers. In any event, Douglass was not

paid by *Hustler* for the right to publish nude photos of her.

Of course the issue in *Zacchini* was not whether the common law created a right of action against the television station—let alone the common law of Illinois (the case came from Ohio)—but whether the Constitution barred such a right of action if it existed in state law. There are no Illinois cases like *Zacchini*. But forced to guess, we guess that Illinois would recognize a "right of publicity" on the facts of *Zacchini* and the analogous facts of the present case. Indeed, this may be an easier case than *Zacchini*, where the performance had been in public, though in a different medium. This case approaches very closely to a violation of common law copyright, as in the theft and unauthorized publication of an author's manuscript. Of course Douglass would have no claim if Gregory had gotten a general release from her. But by executing only a limited release, she retained a right in the photos he took of her that, if not quite a property right, is nevertheless given legal protection under the (misleading) rubric of privacy.

■ But it was error to allow the jury to find an invasion of Douglass's right of publicity in the fact that *Hustler* published stills from her movies and television shows—whether reversible error we need not decide (for reasons to appear). Apparently these stills were in the public domain, for they had been published and *Hustler* is not accused of copyright infringement in republishing them. Republishing previously published, uncopyrighted photographs of a celebrity is a fair use justified by the newsworthiness of celebrities, and it therefore does not violate the right of publicity. *Ann-Margret v. High Society Magazine, Inc., supra,* 498 F.Supp. at 406–07. To forbid *Hustler* to publish any photographs of people without their consent, merely because it is an offensive, though apparently a lawful, magazine, would pretty much put *Hustler* out of the news business, would probably violate the First Amendment, and would in any event cross outside the accepted boundaries of the right of publicity.

But as noted earlier the nude photographs of Douglass that *Hustler* published had not been published before. They were, in a sense that tort law recognizes, part of her portfolio. She had a legally protected interest in deciding at least their first place of publication, provided *Playboy* did not exercise its right to publish them or to license their publication to others, a right for which Douglass had been compensated in executing the release to *Playboy.*

■ Although we reject *Hustler*'s argument that Douglass failed to prove an invasion of her right of privacy, we must also consider among other issues whether a reasonable jury could have found "actual malice" by *Hustler*. For failure to show actual malice would (possibly subject to qualification, as we shall see) be a defense, based on the First Amendment, to her tort suit. As the term is used in relation to the limitations that the First Amendment has been held to place on suits for defamation and "false light" invasion of privacy, it means knowledge of falsity or reckless disregard for truth. See, e.g., *Time, Inc. v. Hill, supra,* 385 U.S. at 387–88, 87 S.Ct. at 541–542.

■ As *Hustler* does not so much as argue that it ever believed that Douglass was a lesbian, it was at the very least reckless in representing her as one, which we said a reasonable jury could have found it had done in "Robyn Douglass Nude." With regard to "actual malice" in representing her as voluntarily associating with the magazine, the only question is whether *Hustler* knew that it was acting without authorization—knew, in other words, that Douglass was not voluntarily associating herself with the magazine—or didn't care. *Hustler* argues that it relied on Gregory to supply authentic releases and cannot be found to have acted with actual malice if he submitted forged ones. The absence of any release from the other woman in the "Ripped-Off" pictorial undermines this claim; but a more important point is that Gregory was *Hustler*'s photography editor, acting within the scope of his employment, so that his knowledge of the falsity of the

releases was the corporation's knowledge. It makes no difference whether in submitting the photographs he was acting as an independent contractor, as *Hustler* argues, or as an employee. As photography editor, which is to say in his capacity as an employee, he had some—it does not matter precisely how much—responsibility for the provenance of the photographs that were published. If someone had submitted nude photographs of Robyn Douglass to him without a release and he had told his superiors there was a release, he would have been acting within the scope of his employment. It makes no difference that in fact he was the seller as well as the buying agent. The doctrine of respondeat superior is fully applicable to suits for defamation and invasion of privacy, notwithstanding the limitations that the First Amendment has been held to place on these torts. See, e.g., *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 253–54, 95 S.Ct. 465, 470–471, 42 L.Ed.2d 419 (1974); *Hunt v. Liberty Lobby*, 720 F.2d 631, 648–49 (11th Cir.1983).

Although there is no basis for ordering the complaint dismissed, there were a number of trial errors which together persuade us that there must be a new trial. The first relates to the judge's failure to instruct the jury that it must find actual malice by "clear and convincing" evidence. This is one of the requirements that the Supreme Court has imposed in the name of freedom of the press on suits for defamation (see discussion in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 1958–65, 80 L.Ed.2d 502 (1984)); and we can think of no reason why it might be inapplicable to suits against the press for invasions of privacy, at least when the invasion takes the form of casting the plaintiff in a false light—a form of invasion of privacy that, as we have seen, overlaps the tort of defamation. Courts have assumed as a matter of course that the requirement of proving actual malice by clear and convincing evidence indeed applies to the false-light tort. See, e.g., *Bichler v. Union Bank & Trust Co.*, 715 F.2d 1059, 1063–64 (6th Cir.1983).

The judge here said that his error did not matter because the evidence of actual malice *was* clear and convincing. It may have been, but that did not make the error harmless. Douglass was not entitled to a directed verdict. Therefore the error in the instruction on burden of proof was not harmless. See, e.g., *Meiners v. Moriarity*, 563 F.2d 343, 350–51 (7th Cir.1977); *Voigt v. Chicago & Northwestern Ry.*, 380 F.2d 1000, 1004 (8th Cir.1967).

All of this assumes of course that actual malice must be proved regarding even so mundane a question as whether consent was obtained to publish some photographs, which is the only question on which *Hustler*'s knowledge is a matter of fair debate. As an original matter we would have our doubts. The purpose of requiring proof of knowledge of falsity, or reckless disregard for the truth, is to lighten the investigative burdens on the press of determining the truth of what it writes. It is no great burden to determine whether a release has been executed; it is not like ascertaining the truth about allegations that a government official took a bribe or engaged in insider trading or fudged casualty statistics. A requirement that the plaintiff prove that the defendant was negligent in mistaking the existence of the release might be quite enough to protect the press from having to make costly investigations. The contrary argument is that the law under the First Amendment is complicated enough without attempting to make distinctions among the types of fact as to which actual malice is required in torts so closely related as defamation and false light. The qualification, however, and the analogy to copyright which supports Douglass's right-of-publicity claim, suggest that knowledge or even care is irrelevant at least to that claim; for it is no defense to copyright infringement that the infringer reasonably but mistakenly thought he had a license. See, e.g., 3 Nimmer on Copyright § 13.08 (1984).

Fortunately we need not try to unravel this tangled skein. The plaintiff does not

argue that she was excused from having to prove actual malice because of the nature of her claim or the nature of *Hustler*'s falsity in regard to her. She does argue that she was excused from having to prove actual malice because she is not a public figure. But a successful actress and model who has appeared nude many times in *Playboy* magazine cannot be called a "private person"; she is a public figure in a literal sense. The lifting of the burden of proving actual malice in defamation cases from the shoulders of plaintiffs who are not public figures reflects two things: the fact that people who do not thrust themselves into the public eye have on average a greater sense of privacy than those who do; and the difficulty that obscure people have, compared to celebrities, in commanding the media's attention to efforts to rebut innuendoes about them (whether defamatory, or merely offensive in a false-light sense). See *Gertz v. Welch*, 418 U.S. 323, 344–45, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). But not only is Robyn Douglass no shrinking violet; she is a budding celebrity eager to be seen in the nude by millions of people—she *had* been seen in the nude by millions of people, the readers of *Playboy*, before *Hustler* got hold of her photographs. She is not like the plaintiff in *Braun v. Flynt, supra*, who did not become a public figure merely because her job in a local amusement park included feeding "Ralph, the Diving Pig" from a bottle of milk while treading water.

▮▮▮ As an original matter one might want to confine the class of public figures to government officials and other politicians; freedom of political speech, and in particular freedom to criticize government officials and aspirants to public office, was the original concern of the First Amendment. But it is too late in the day to make such a distinction, at least at this judicial level. Art, even of the questionable sort represented by erotic photographs in "provocative" magazines—even of the artless sort represented by "topless" dancing—today enjoys extensive protection in the name of the First Amendment. See, e.g., *Doran v. Salem Inn, Inc.*, 422 U.S.

922, 932–34, 95 S.Ct. 2561, 2568–2569, 45 L.Ed.2d 648 (1975); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1371–73 (5th Cir.1980). And so with news about art and entertainment. Entertainers can therefore be public figures for purposes of a publisher's or a broadcaster's First Amendment defense to a charge of false-light invasion of privacy. See, e.g., *Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 136–38 (2d Cir.1984); *Ann-Margret v. High Society Magazine, Inc., supra*, 498 F.Supp. at 404–06; *Vitale v. National Lampoon, Inc.*, 449 F.Supp. 442, 445–46 (E.D.Pa.1978). Robyn Douglass clearly is· one.

There is, incidentally, some question whether a plaintiff in a false-light case, merely because he (or she) is not a public figure, is relieved from having to prove actual malice, as would be true in a defamation case. The question was left open in *Cantrell v. Forest City Publishing Co., supra*, 419 U.S. at 250–51, 95 S.Ct. at 469. An argument can be made that the injury that being cast in a false light creates is less serious than that created by being defamed, and therefore the plaintiff should have a tougher row to hoe. We need not resolve the question here, but mention it lest our discussion of whether Robyn Douglass is a public figure be taken to have resolved it implicitly.

▮▮▮ The next trial error relates to the "slide show." An expert witness on the issue of *Hustler*'s offensiveness accompanied his testimony with a projection of 128 slides showing some of the vilest photographs and cartoons to have been published in *Hustler* over the years. The plaintiff argues that the slide show, which lasted almost an hour, was an intrinsic part of the expert's testimony; and *Hustler*'s first counter is that the expert was unqualified. But he was an experienced English teacher, writer, and editor; and if there are to be expert witnesses on tastelessness and vulgarity, he was well qualified to be one. It can be argued that such things do not lend themselves to expert testimony. Unlike an ordinary witness, an expert witness is al-

lowed to express an opinion; he is not confined to observation; and it might seem that opinions on matters of taste have no objectivity and that to allow them to be pushed at juries is to invite censorship and undermine the First Amendment. But this view has been rejected with respect to obscenity, see *United States v. Bagnell,* 679 F.2d 826, 833–34 (11th Cir.1982), and cases cited there, and we can think of no basis for distinguishing false-light cases. Expert testimony is not required on matters of taste, see *Pinkus v. United States,* 436 U.S. 293, 302, 98 S.Ct. 1808, 1814, 56 L.Ed.2d 293 (1978), but neither is it forbidden.

Putting constitutional concerns aside, therefore, as insubstantial, we note that Rule 702 of the Federal Rules of Evidence defines the scope of permissible expert testimony very broadly. The rule and accompanying Advisory Committee Note indicate that such testimony is admissible whenever it concerns a topic on which a lay jury would be assisted by such testimony, and that the term "expert" includes the skilled layman—and the witness here was more. Although we are skeptical that an expert should have been allowed to testify on so vague, subjective, and impressionistic an issue as offensiveness, we cannot say as a matter of law that expert testimony could not have helped the jury reach an intelligent decision. A particular jury cannot be assumed to be familiar with the world of "provocative" magazines and therefore able to make the nice discriminations on which Douglass's case rests.

■ But while the expert's testimony was admissible, the prejudicial effect of the parade of filth in the slide show so clearly outweighed its probative value as to require exclusion under Rule 403 of the Federal Rules of Evidence. The plaintiff could have given the jury representative issues of *Hustler* to study but instead she put in evidence just the issue in which "Robyn Douglass Nude" appeared, plus some issues of *Playboy*—and the slides. To pick out the 128 worst pictures from many years of the magazine (there is no pretense that the pictures are a random or representative sample of the magazine's contents) was to assail the senses and distract the mind, especially since projecting the slides on a large screen magnified the visual impact of the pictures as they appear in the magazine itself. The pictures apparently were selected with a view to highlighting the most offensive features of the magazine. The viewer of the slide show would think the magazine wholly given over to racially offensive cartoons, grotesque photographs (e.g., of a hermaphrodite), foul language, and scatological as well as sexual obscenities. Of course these are aspects of the magazine and ones that legitimately distinguish *Playboy* from it. But bad as it is, *Hustler* is not so concentratedly outrageous as the slide show would make a viewer think.

Although the district judge enjoys a broad discretion in balancing prejudice and probative value under Rule 403, we think he exceeded the limits of that discretion in this instance, and note that he himself remarked after the slide show that he had made a mistake in allowing it. In another setting such a mistake might not warrant a new trial. But the Supreme Court has told us (most recently in the *Bose* case, see 104 S.Ct. at 1962) to be assiduous in protecting the press, even in its least worthy manifestations, from the fury of outraged juries.

■ There is next the settlement agreement between photographer Gregory and plaintiff. Douglass whereby he agreed to testify truthfully and in accordance with his deposition in exchange for her agreeing not to execute any judgment that the jury might bring in against him. The agreement was not disclosed to the jury, thus distinguishing *Quad/Graphics, Inc. v. Fass,* 724 F.2d 1230 (7th Cir.1983) (a bench trial), on which the plaintiff relies, and a similar case, *Bass v. Phoenix Seadrill/78, Ltd.,* 749 F.2d 1154, 1158 (5th Cir.1985). While the plaintiff argues vigorously that the settlement was disclosed to *Hustler*'s lawyer, the evidence on this point is in hopeless conflict, the judge made no finding, and so for purposes of this appeal we

must treat it as undisclosed. Thus, not only did the jury think Gregory a real defendant, but (we must assume) so did his codefendant—though in fact Gregory had a financial interest in not giving evidence unfavorable to the plaintiff unless he thought his evidence would make it certain that the jury would bring in a verdict in his favor, in which event he would not have to worry about a judgment being executed against him. Armed with knowledge of the deal between Douglass and Gregory, *Hustler* might have been able to conduct an effective cross-examination; as it was, it naturally tended to "lay off" hectoring a codefendant.

■ Finally, the award of compensatory damages was so excessive that the jury must have been carried away by "passion and prejudice" (perhaps as a partial consequence of the slide show). The jury must have accepted all or most of the expert's estimate that Douglass had lost almost $717,000 (present value) in earnings as a result of the invasion of her right of privacy, and must then have added on almost $300,000 in damages for emotional suffering; for it thought it was awarding a total of $1,000,000 in compensatory damages, half against each defendant, for a single tort committed jointly by the two defendants. We do not suggest that the $600,000 that was actually awarded Douglass—after the agreement not to execute the judgment against Gregory was invoked and after Douglass accepted the judge's remittitur of most of the punitive damages—was excessive. *Hustler*'s argument is that the amount of compensatory damages that the jury thought it was awarding—$1 million— was so excessive as to show that the jury must have been swept away by passion and prejudice, in which event there must be a new trial; a jury whose judgment on damages was so impaired cannot be trusted to have determined liability accurately, either. See, e.g., *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1389 (7th Cir.1984); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 282–83 (5th Cir.1975).

■ The more than $700,000 in lost earnings to which Robyn Douglass's economic expert testified was his estimate of the present value of the earnings she would have had from making commercials for advertising agencies in Chicago, had not the publication of "Robyn Douglass Nude" in *Hustler* cut off that stream of earnings by scaring away the agencies. There are two problems with the estimate. One, subtler and less important, is that in discounting to present value the economist failed to correct for the extreme riskiness of the earnings stream for which he was trying to find a present value. An award of damages is a sum certain. If it is intended to replace a stream of earnings that is highly uncertain—surely an understatement in discussing earnings in the field of entertainment—then risk aversion should be taken into account in computing the discount (interest) rate. The riskless rate of interest might be as low as two percent, if inflation is ignored, see, e.g., *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199 (7th Cir.1982); and this would be the proper rate if the earnings stream that the damages award was intended to replace was one that would have been obtained with certainty. But earnings are not certain; particularly are they not certain in the entertainment industry. The appropriate interest rate is therefore higher than two percent, implying a lower award of damages. This adjustment is needed to reflect the preference of a risk-averse individual for a smaller amount, received with certainty, to a larger expected amount that is subject to great uncertainty. (Most people are risk averse in relation to substantial financial matters, though many people drawn to economically risky occupations such as entertainment must be less so.) The expert and the jury ignored this point.

■ The more serious problem is that the expert's computation ignored Douglass's opportunities in other markets. She may be *persona non grata* to advertising agencies in Chicago because of *Hustler*, but Chicago is not the world; and not only is she continuing to appear in movies but there is not a shred of evidence that she

could not have made commercials in other cities, less staid than Chicago, such as New York and San Francisco. The economic expert (a professor of finance) testified rather guilelessly that it was as if one division of a multi-division corporation had been driven out of business; Douglass's "Chicago acting career" had been shut down. But having limited time, she cannot have an indefinite number of separate "divisions"; if she is shut out of one market, it frees up time to devote to others. Maybe there are no others to which she could devote all the time she once spent working for Chicago's advertising agencies, but there is no evidence that her resources are completely immobile. *Hustler*'s violation of her right of privacy created earnings opportunities for her, by freeing up time previously devoted to making commercials for Chicago advertising agencies. And while these opportunities may have been less lucrative than those that *Hustler* destroyed, any income they would have yielded her had to be deducted in estimating her damages from the tort, under the doctrine of avoidable consequences, which is the counterpart to the duty in contract law to mitigate damages. See, e.g., *Slater v. Chicago Transit Authority*, 5 Ill.App.2d 181, 185, 125 N.E.2d 289, 291 (1955); *EVRA Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 958 (7th Cir. 1982); *Goldstein v. Kelleher*, 728 F.2d 32, 38–39 (1st Cir.1984); *East Hampton Dewitt Corp. v. State Farm Mutual Automobile Ins. Co.*, 490 F.2d 1234, 1238–39 (2d Cir.1973) (Friendly, J.).

The $300,000 for emotional distress is an absurd figure. Though distressed by the *Hustler* incident, Douglass suffered no severe or permanent psychiatric harm— nothing more than transitory emotional distress (some of it from obscene phone calls stimulated by the publication). The figure is ridiculous in relation to the highest judgment yet upheld on appeal in a series of cases arising from the Chicago Police Department's former practice of "strip searching" women arrested for minor crimes (mainly traffic offenses): $60,000. This was in *Mary Beth G. v. City of Chica-*

*go*, 723 F.2d 1263, 1275–76 (7th Cir.1983), where the plaintiff was strip searched in the presence of two male police officers and jeering prostitutes. We have repeatedly emphasized—and take this opportunity to emphasize again—that we will not allow plaintiffs to throw themselves on the generosity of the jury; if they want damages they must prove them. See, e.g., *Taliferro v. Augle*, 757 F.2d 157, 162 (7th Cir.1985).

We do not want to be understood as suggesting that because the plaintiff posed nude for *Playboy* magazine, with its audience of millions, she has no vulnerability to emotional distress from seeing herself nude—perhaps represented as a lesbian—in the pages of *Hustler*. But it would be extremely naive to regard her as a blushing violet who can be presumed to have suffered an emotional injury so serious that $300,000 is a reasonable estimate of its pecuniary equivalent. In *Braun v. Flynt, supra*, only $15,000 in compensatory damages were awarded for the embarrassment created by the defendant's invasion of the plaintiff's privacy. See 726 F.2d at 255. Modest compensatory damages are, as they should be, the norm in these cases. See cases discussed in *Lerman v. Flynt Distributing Co., supra*, 745 F.2d at 141. In *Time, Inc. v. Firestone*, 424 U.S. 448, 460–61, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976), a libel case but one in which the plaintiff sought damages for emotional distress rather than for lost reputation, the Supreme Court upheld an award of $100,000 in compensatory damages. Not only is this much less than the jury awarded for similar injury in this case, but a false accusation of adultery made in a reputable national magazine is more likely to cause distress than what *Hustler* did to Douglass. The highest award for emotional injury in a false-light case that to our knowledge has been upheld on appeal, $150,000 to the plaintiff in *Wood v. Hustler Magazine, Inc., supra*, 736 F.2d at 1093–94, was not only half the award in this case but was in favor of a woman who had not thought the nude photograph of her would ever be made public, and who therefore may have

had a greater sense of privacy than Robyn Douglass.

So there must be a new trial. For the guidance of the district court and the parties on remand we make three further observations about damages.

■■■■ 1. Since there must be a new trial on all issues we have no occasion to review the judge's remittitur of all but $100,000 of the punitive damages. As a matter of fact, we cannot review it. The acceptance of a remittitur precludes an appeal from the remittitur, whether a direct appeal or a cross-appeal. *Shor-Line Rambler, Inc. v. American Motors Sales Corp.,* 543 F.2d 601, 605–06 (7th Cir.1976); *Higgins v. Smith Int'l, Inc.,* 716 F.2d 278, 282 (5th Cir.1983), and cases cited there. But since the question whether to grant a remittitur may arise on remand should the jury again award punitive damages, we suggest that the use of a remittitur to reduce damages to $100,000 in this case would be inconsistent with the principal purpose of punitive damages, which is to deter. "[B]efore a court can gauge the award [of punitive damages], it must first gauge the financial position of the wrongdoer." *Hazelwood v. Illinois Central Gulf R.R.,* 114 Ill.App.3d 703, 713, 71 Ill. Dec. 320, 450 N.E.2d 1199, 1207 (1983). *Hustler* is immensely profitable; an award of punitive damages reduced to $100,000 might have little effect on its propensity, well documented in several of the cases we have cited, to invade people's legal rights.

This is not to say that the sky is the limit. The plaintiff should be required to establish, at least within rough limits, the profits attributable to *Hustler*'s violation of her rights. Should it prove infeasible to disentangle the various factors that contributed to the profitability of the January 1981 issue of the magazine, and to determine the effect that "Robyn Douglass Nude" may have had on the profitability of subsequent issues, the profits of the entire January 1981 issue might be a reasonable starting-point for assessing punitive damages. This is a matter for further explora-

tion on remand if the jury is again asked to award punitive damages.

■■■ 2. Courts are divided on whether punitive damages can be awarded against a corporation for the acts of its employees on a theory of respondeat superior, or whether some actual fault by officers of the corporation must be shown (the "complicity rule"). Compare *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1278–79 (3d Cir.1979) (en banc), and *Embrey v. Holly,* 293 Md. 128, 134–40, 442 A.2d 966, 969–73 (1982), with *Petrites v. J.C. Bradford & Co.,* 646 F.2d 1033, 1037 (5th Cir. 1981), and *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 842–43 (2d Cir. 1967) (Friendly, J.). This is a question of state law; it is not of constitutional dignity. Although there is evidence that officers of *Hustler* knew they had no authority to publish the Douglass photographs, the evidence is not conclusive. The question whether to instruct the jury that to award punitive damages it must find such knowledge, or whether the knowledge of Gregory, the corporation's employee, was enough, may therefore become important on remand.

If free to do so we would follow what apparently is still the majority rule that punitive damages can be awarded against an employer for an employee's wrongdoing without proof of fault on the employer's part. See Prosser and Keeton on the Law of Torts, *supra,* § 2, at 13. Unless a corporation that profits from the wrongdoing of its agents is made to bear the cost of that wrongdoing, the corporation will have an incentive to conduct its affairs through judgment-proof employees, and will escape punishment for wrongdoing that it condones and profits from. But the question is no longer an open one for a federal court in a diversity case governed by Illinois law. *Tolle v. Interstate Systems Truck Lines, Inc.,* 42 Ill.App.3d 771, 772–74, 1 Ill.Dec. 437, 356 N.E.2d 625, 626–27 (1976), and *Oakview New Lenox School Dist. No. 122 v. Ford Motor Co.,* 61 Ill.App.3d 194, 199–200, 19 Ill.Dec. 43, 378 N.E.2d 544, 548–49 (1978), adopt the complicity rule. Although

**1146**

neither case involved defamation or privacy, it would be odd to deny the protection of the complicity rule to the media, see also *Holda v. County of Kane*, 88 Ill.App.3d 522, 536, 43 Ill.Dec. 552, 410 N.E.2d 552, 563 (1980) (opinion of one judge); and although neither is an Illinois Supreme Court case, both rely on an Illinois Supreme Court case which implies though without quite holding that the rule is indeed part of the common law of Illinois. See *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 36–37, 330 N.E.2d 509, 512 (1975) (Schaefer, J.).

■ 3. Although no party objected to the judge's asking the jury to assess compensatory damages separately against the two defendants, there is no legal basis for such a method of assessment. *McKinnon v. City of Berwyn, supra*, 750 F.2d at 1387. The purpose of compensatory damages is to make the plaintiff whole; and if, as here, the injury is an indivisible consequence of the acts of two joint tortfeasors, each is jointly and severally liable to the plaintiff for that injury, subject to whatever rights of contribution they may have between themselves. Only punitive damages should be assessed against the defendants separately unless the injuries inflicted by the defendants are divisible.

The judgment is reversed and the case remanded for a new trial. No costs in this court.

REVERSED AND REMANDED.

SUPPLEMENTAL OPINION ON
PETITION FOR REHEARING

Although our decision reverses the judgment for the plaintiff and remands for a new trial, the defendant, Hustler, seeking a more complete victory, has filed a petition for rehearing in which it questions various aspects of our opinion. Most of the points raised by Hustler are dealt with adequately in our original opinion; three are not.

1. We said in the original opinion that Hustler Magazine is immensely profitable; in so saying, we apparently strayed outside of the record. We retract the comment;

the profitability of *Hustler* will be an issue of fact on remand, should the plaintiff again seek an award of punitive damages.

2. We neglected to mention *Bureau of Credit Control v. Scott*, 36 Ill.App.3d 1006, 345 N.E.2d 37 (1976), where the Illinois Appellate Court intimated that there is no "false light" tort in Illinois law. *Scott* was a suit to collect a small claim; the defendant, Scott, counterclaimed, and one count in the counterclaim (Count III) alleged that the plaintiff had placed Scott in a false light by calling her a "deadbeat." The court, in dismissing Count III (over dissent) in the briefest of discussions, noted that there was no need to create a new remedy since Count I, which it upheld, alleged intentional infliction of emotional distress and would provide all the relief that Scott sought. The decision, a split decision by an intermediate court on facts remote from those in the usual false-light case, cannot be considered persuasive authority against the existence of the tort in Illinois, especially given the contrary thrust of the Illinois Supreme Court's opinion in the *Leopold* case, discussed in our original opinion.

■ 3. Hustler argues that in holding that a reasonable jury could have found it guilty of actual malice, we forsook our duty under *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), and cases cited there, to make an independent review of the jury's finding of malice. Although *Bose* itself involved judge rather than jury findings, its principle is applicable to the latter as well as the former. See *id.* at 1964 n. 27. We had supposed from Hustler's briefs that it was relying on *Bose* for the proposition—which we accepted—that the judge had instructed the jury erroneously, not for the broader proposition that we must make an original finding on the issue of malice, to the extent it is possible for us to do so without benefit of having seen and heard live witnesses, as the jury did. The question assumes rather an abstract cast given that we have reversed and remanded for a new trial, where there will be new findings, and a further

appellate review if the losing party desires it. Nevertheless we have now done what Hustleer asks, and reviewed the finding of actual malice *de novo* to the best of our ability, and we have concluded that the jury's finding was not only within the bounds of reason, but was, so far as we are able to determine from the cold record, a correct finding. The more important point however is that the issue of actual malice will have to be retried because of the error in instructing the jury on the issue and the other trial errors discussed in our original opinion.

Subject to the above qualifications, the petition for rehearing is DENIED.