Filed 4/22/15  Banks v. General Atomics CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PAUL BANKS,<br><br>        Plaintiff, Cross-defendant and Appellant,<br><br>        v.<br><br>GENERAL ATOMICS,<br><br>        Defendant, Cross-complainant and Appellant;<br><br>GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.,<br><br>        Defendant and Respondent;<br><br>TETRAVUE, INC.,<br><br>        Cross-defendant and Appellant. | D062906<br><br><br>(Super. Ct. No. 37-2009-00084081-CU-BC-CTL)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on April 2, 2015, be modified as follows:

On page 17, at the end of the first paragraph, after the sentence ending "the factual matters we discuss below are undisputed on appeal," add as footnote 6 the following footnote, which will require renumbering of all subsequent footnotes:

[6] In a petition for rehearing filed April 17, 2015, GA continued to argue the insufficiency of the record on appeal and further argued it was deprived the opportunity to brief the "belatedly submitted summary judgment evidence." We found neither contention persuasive and denied the petition. Specifically, the two historical facts discussed in the following paragraph in this opinion's text are admitted in GA's own summary judgment briefing to the trial court, which is contained in GA's own appellant's appendix. Thus, for purposes of our review, we concluded the record was sufficient and that GA had an adequate opportunity to brief the issues.

There is no change in the judgment.

Defendant, cross-complainant and appellant General Atomics's petition for rehearing is denied.

BENKE, Acting P. J.

Copies to: All parties

Filed 4/2/15 (unmodified opnion)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| PAUL BANKS,<br><br>Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>GENERAL ATOMICS,<br><br>Defendant, Cross-complainant and Appellant;<br><br>GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.,<br><br>Defendant and Respondent;<br><br>TETRAVUE, INC.,<br><br>Cross-defendant and Appellant. | D062906<br><br><br>(Super. Ct. No. 37-2009-00084081-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed in part and reversed in part.

Boudreau Williams, Jon R. Williams; Smith, Steiner, Vanderpool & Wax, Jon Y. Vanderpool; Tosdal Law Firm and Thomas Tosdal for Plaintiff, Cross-defendant and Appellant Paul Banks and Cross-defendant and Appellant Tetravue, Inc.

Paul, Plevin, Sullivan & Connaughton, Richard A. Paul; Pillsbury Winthrop Shaw and Pittman, Aaron S. Dyer; Law Offices of Martin N. Buchanan, Martin N. Buchanan; Cadwalader, Wickersham & Taft, Orrick, Herrington & Sutcliffe and Jason M. Halper for Defendant, Cross-Complainant and Appellant General Atomics and Defendant and Respondent General Atomics Aeronautical Systems, Inc.

A jury returned a verdict in favor of Paul Banks on his fraud and contract claims, which alleged General Atomics (GA) lured him away from stable employment on the promise that GA would grant him "equity" or "ownership" in a newly formed division of GA. On the fraud claim, the jury awarded Banks $2.9 million in compensatory damages and $5.8 million in punitive damages. On the contract claim, the jury awarded Banks $6 million. Viewing the fraud and contract remedies as inconsistent, the trial court required Banks to elect between them. Banks chose his fraud claim and consented to remittitur of the punitive damage award to $2.9 million after the court conditionally granted GA's new trial motion on the basis of excessive punitive damages.

GA appeals the judgment on several grounds. First, GA contends the trial court erred by allowing Banks to pursue his fraud claim at trial because the court had already summarily adjudicated a similar statutory fraud claim (Labor Code section 970) against

2

him.[1]  Second, GA challenges the sufficiency of the evidence supporting the jury's verdict on Banks's fraud claim.  Third, GA contends the trial court erred by allowing Banks to present his lay opinion of the present value of his lost future employment benefits.  Finally, anticipating we might reverse the judgment as to Banks's fraud claim, GA contends deficiencies in the judgment with respect to Banks's contract claim preclude us from affirming the judgment on that alternative basis.

Banks also appeals the judgment on several grounds.  First, he contends the trial court erred by summarily adjudicating his Labor Code section 970 claim.  Second, he contends the trial court erred by requiring him to elect between recovering on his fraud and contract claims.  Finally, Banks contends the trial court erred by conditionally granting GA's new trial motion unless he consented to remittitur of his punitive damages award.

We conclude (1) the trial court erred by summarily adjudicating Banks's Labor Code section 970 claim and, consequently, the trial court did not err by allowing Banks to submit his common law fraud claim to the jury; (2) the trial court did not abuse its discretion by allowing Banks to testify regarding the present value of his future employment benefits; (3) substantial evidence supports the jury's verdict on Banks's fraud claim; (4) the trial court did not err by requiring Banks to elect between his fraud and contract remedies; and (5) the trial court did not err by conditionally granting GA's

---

[1]  "Labor Code section 970 prevents employers from inducing employees to move to, from, or within California by misrepresenting the nature, length or physical conditions of employment."  (*Seubert v. McKesson Corp.* (1990) 223 Cal.App.3d 1514, 1522, disapproved on other grounds in *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384.)

3

motion for new trial. Because we affirm the judgment on Banks's fraud claim, we do not address GA's challenges to his contract claim.

## FACTUAL BACKGROUND

James Neal Blue is the chief executive officer, president, and chairman of the board of GA, a defense research, production, and development company headquartered in San Diego. He is also the chief executive officer and chairman of the board of General Atomics Aeronautical Systems, Inc. (ASI), which makes aircraft and reconnaissance systems for the U.S. military, including unmanned aircraft systems such as the Predator. Blue's family privately holds all the shares of General Atomics Technologies Corporation, a holding company for the GA companies.

During the telecommunications "dot.com boom" in the late 1990's, Blue became interested in the business potential of laser applications. GA eventually created a new business division to develop "photonics" technologies (technologies based upon the flow of photons) for various laser applications in the defense industry and in other commercial settings. The division was later named Photonics.

David Baldwin, a senior vice president in GA's Energy Group who reported directly to Blue, recruited Michael Campbell to join GA as a vice president in its Energy Group. Baldwin and Campbell had previously worked together at Lawrence Livermore National Laboratory (Lawrence Livermore), a national security laboratory then run by the University of California. Lawrence Livermore was well-established, enjoyed an excellent worldwide reputation in laser research, and provided "enormously good" employment benefits, such as medical and retirement. According to Campbell, it offered

4

"essentially a life employment if you chose to do it."  But Lawrence Livermore did not offer equity or ownership of intellectual property.

Blue and Baldwin encouraged Campbell to attempt to recruit Lawrence Livermore scientists for Photonics.  According to Campbell, Blue authorized him to tell the scientists he recruited for Photonics that they would receive equity or ownership in the business they built.  Campbell and Blue recruited Michael Perry from Lawrence Livermore, who joined as director of what would become Photonics.  According to Perry, Blue promised him a 4 percent "equity" or "ownership" interest in Photonics.  Perry was tasked with recruiting a core group of scientists, and GA management told him to use "equity participation" as a recruiting tool.

Perry recruited Banks from Lawrence Livermore because he considered Banks "an exceptional talent" in his subfield of physics.  Campbell and Perry recruited three other scientists from Lawrence Livermore:  Matthew Kendall, Ian Barton, and Steve Herman. In the spring of 2000, GA flew Perry, Banks and other Lawrence Livermore recruits down to San Diego to tour its facilities and to meet its executives.  During those visits, Baldwin and Campbell told Banks that as a Photonics "founder" he would receive "ownership in the division" and was "going to be able to get a piece of the pie."[2]  Banks took notes of some of these conversations, quoting Perry on one occasion as saying Photonics "will split off at some point — orig people getting 'founders shares.' "

---

[2]     Perry and the four recruits called themselves the "founders" of Photonics.  Perry defined a founder generally as someone who had a specific skill set needed to build the Photonics division and with whom ownership participation had been discussed.  Several others were later added to the founders group.

By letter dated April 14, 2000, GA offered Banks a job. The letter specified his salary and benefits, including eligibility for GA's incentive compensation program, but made no mention of equity or ownership in Photonics. The letter also stated: "[I]t is understood that you are not accepting our employment offer in reliance on any statements made by any company representative, other than those contained in this offer letter and that this letter supersedes any such contrary statements."

After receiving the letter, Banks asked Campbell why the offer did not include equity. Campbell explained that because GA was a private company, they were still working out the mechanics. Campbell reassured Banks that GA "would definitely . . . follow through on the promise." After weighing the pros and cons of the offer, Banks declined. Campbell and Perry encouraged Banks not to make a final decision and encouraged further dialog to address Banks's concerns. In May 2000, GA made Banks a new employment offer that increased his base salary by $7,000 and confirmed all the other terms of GA's April 14 offer letter. In reliance on Campbell's earlier assurances, Banks accepted GA's offer on May 17.

With permission from Lawrence Livermore, Banks began doing work for GA in June 2000 while he was still working full-time at Lawrence Livermore. Lawrence Livermore encouraged Banks to stay.

On June 20 and 21, 2000, the so-called Photonics founders participated in an off-site meeting at the Morgan Run Resort in San Diego. Banks was still a full-time employee at Lawrence Livermore. Baldwin, Campbell, Perry, and Blue were present for all or part of the meeting. Perry delivered a Power Point presentation about potential

6

equity participation that included slides depicting "examples of where start-up companies had been started where the employees, the founders got shares of the business and benefited from the success of the companies when they were sold or were going public." GA management told the participants Photonics "was going to be a start-up, like these other companies . . . and the participation by the employees was going to be the same as these example companies." Perry, Campbell, and Baldwin indicated the goal was to distribute ownership pretty evenly among the founders.

Blue spoke during the second day of the meeting. He "essentially reinforc[ed] everything that everybody had been saying: It was going to be like a start-up, a different culture, we were going to accomplish great things, take advantage of the new technology that we could develop, and that everyone would be a participant in the success." In reliance on the representations made during the Morgan Run off-site meeting, Banks confirmed the termination of his employment at Lawrence Livermore and moved to San Diego in August 2000.

In 2001 and 2002, the founders periodically had meetings among themselves to discuss the status of an equity interest in Photonics. Campbell and Perry reassured the founders that "GA was going to follow through with its promises," but "it would take longer than they had expected." In October 2002, Blue met with the founders in his executive conference room for about an hour. Blue told them "he was committed to equity in the Photonics division and that [GA was] in the process of working out the agreement." He said employees of Photonics would receive a 20 percent share, with 15 percent for the founders and 5 percent for other key employees. According to Banks,

"the message that had been communicated was that amongst the founders, people would be more or less equally compensated" subject to some "adjustments based on position and other things." This equated to an approximately 2 percent equity stake for Banks in Photonics (15 percent divided roughly equally among seven or eight founders).[3] GA's general counsel, Randy Walti, was tasked with working out the details.

In August 2003 Walti circulated a "Phantom Unit Plan."[4] This proposed plan established a benefits committee to designate participants and award "phantom units," which were defined as a contractual right to receive cash or property upon surrender of the units to GA, sale of Photonics or one of its three lines of business, or reorganization of the division. Each unit was valued at $31,250 and represented one-sixteenth of 1 percent of the Photonics division's total business, which included "commercial/government lasers and components," "advanced EO/IR sensors," and "ultra wideband semiconductors." The Phantom Unit Plan expressly disclaimed any equity or ownership interest in GA.

Although Banks initially characterized the Phantom Unit Plan as "a good start," his opinion changed and the founders rejected the proposal when GA later explained the phantom shares would generate immediate, significant tax liabilities for the founders—

---

[3]  Banks would later base his breach-of-contract claim on Blue's statements made during this meeting.

[4]  Banks asserts in his opening brief that Walti circulated an earlier revision in April 2003 that acknowledged "partial ownership will be given to the founders and key employees," specifically acknowledging "founding employees of Photonics will hold 15%." However, Banks's record citation is to a trial exhibit and not to the record before us.

several hundred thousand dollars worth—before they received any cash under the plan. The founders also considered the plan's disclaimer of an ownership interest inconsistent with GA's prior representations.

After the founders rejected the Phantom Unit Plan, GA awarded enhanced bonuses to the employees in Photonics to reward them for their contributions. After receiving bonuses no greater than $6,750 for 2000, 2001, 2002, and 2003, Banks received bonuses of $22,400 for 2004, $45,000 for 2005, $26,700 for 2006 (during half of which he was no longer in Photonics), and $24,000 for 2007 (when he was no longer in Photonics).

Walti revised the Phantom Unit Plan to eliminate the tax issue that was of concern to the founders. The new plan, renamed the "Division Unit Plan," resolved the tax concern by eliminating the participants' right to surrender units to GA for an immediate cash payment. As a result, the plan defined "units" as the contractual right to receive (i) cash payments upon the sale of Photonics or one of its three separate lines of business, or (ii) shares of common stock upon reorganization into a separate corporation, partnership, company, or other independent business unit. Like the Phantom Unit Plan, the Division Unit Plan expressly disclaimed any present equity or ownership interest in GA itself. The executive committee of GA's board of directors approved the Division Unit Plan in August 2004.

In November 2004 Banks sent a letter to Blue inquiring about the status of the "written equity sharing agreement." Banks stated in the letter, "I have been very surprised that a final agreement has not been done in four years." He asked, "Will you or your staff explain to me what is the holdup and when will the agreement be put in place?"

9

Blue called Banks in response to the letter. Banks told him "it had been four years and we were still waiting for something in writing." Shortly after this phone call, Perry sent Banks a copy of the board-approved Division Unit Plan.

GA appointed a committee to administer the Division Unit Plan. In late 2004 Perry recommended that Banks receive a "base level" allocation of 1 percent. At some point, a schedule of allocations was submitted to Blue for his approval. Blue rejected the schedule because it included an allocation to Campbell, and there was an ongoing dispute between Blue and Campbell over Campbell's status as a founder and his participation in the plan.

No one was ever awarded any units under the Division Unit Plan. Banks never received any written confirmation of his own ownership percentage. Perry assured him in November 2005 that the equity commitment "need not be in writing." Campbell gave Banks similar assurances, stating things would be more flexible that way.

In July 2006 Banks voluntarily transferred out of Photonics but remained in GA's Energy Group. In doing so, Banks confirmed his founders' equity deal in Photonics would remain intact.

In October 2007 Banks met with Blue alone to discuss a 3-D imaging project. At the end of that meeting, Banks confirmed with Blue that GA would honor its equity commitment to the founders, but Blue qualified the commitment by stating Banks would not be entitled to participate in the success of the "ultra-wide band" (UWB) line if it was spun out of Photonics because Banks had not been involved in the development of this

line.  Banks responded that Blue's UWB limitation was not what he had been promised.  Their conversation ended.

Also in October 2007 Blue fired Campbell and replaced him with retired U.S. Navy Admiral Ronne Froman.  In January 2008 Banks e-mailed Froman to confirm her understanding of the founders' equity arrangements.  Froman replied, "Be happy to discuss.  This has already been discussed with Neal [Blue] and the allocations have been made.  Your place as a founder is recognized."  Froman later reported to Banks that she discussed the written equity agreement with Blue and that Blue's response was that the equity agreement only applied to commercial products, and because Photonics was no longer pursuing commercial products there was no longer any need for a written agreement.  In a later conversation, Froman suggested that because the Division Unit Plan had been approved *but never signed*, the agreement was unenforceable and "GA didn't have to do anything about it."

Banks left GA effective July 2008 to start his own company, TetraVue Incorporated (TetraVue).  GA allowed TetraVue to pursue the 3-D imaging technology Banks had previously discussed with Blue.

Effective January 1, 2009, virtually all of the employees and operations of Photonics were transferred from GA's Energy Group to ASI's laser electro-optics group (LEO).

PROCEDURAL HISTORY

In February 2009 Banks filed his initial complaint.  In his operative fourth amended complaint, Banks alleged claims against GA for breach of oral contract, fraud,

11

Labor Code section 970, and equitable claims against GA and ASI for constructive trust and accounting.

Banks's contract claim alleged breach of an oral agreement to give him "an individual equity ownership share in the Photonics Division of between 1.5% to 2.5% with the attendant right to a corresponding proportional share of the Photonics Division's profits." The complaint alleged the material terms of this oral contract were "confirmed on or after October 2002."

The fraud claim alleged GA fraudulently promised Banks "equity" in the "new Photonics Division" and that Banks relied on GA's false promise to his detriment.

Similarly, the Labor Code section 970 claim alleged GA fraudulently induced Banks to leave Lawrence Livermore and move to San Diego in August 2000 by making knowingly false promises that he would receive equity in the Photonics Division.

GA filed a cross-complaint against Banks and TetraVue alleging, generally, that Banks misappropriated GA trade secrets and other company materials.

GA moved for summary judgment on all of Banks's claims. Superior Court Judge David B. Oberholtzer granted the motion only as to Banks's Labor Code section 970 claim. On that claim, the trial court found: "Giving Banks'[s] evidence and argument the benefit of all supported inferences, he has not rebutted General Atomics' evidence nor shown a disputed issue of material fact regarding its intent at the time. Banks'[s] evidence that General Atomics deceived him later does not support a conclusion General Atomics deceived him from the outset, and Banks has no direct evidence of an earlier scheme."

12

The case was subsequently reassigned to the Honorable William S. Dato for trial. The court bifurcated the trial into three phases: (1) liability and compensatory damages, (2) punitive damages, and (3) equitable issues to be decided by the court following the jury's verdicts. At trial, GA argued the summary adjudication ruling on the Labor Code section 970 claim precluded Banks from relying on any alleged pre-hire misrepresentations to support his common law promissory fraud claim. However, the trial court allowed Banks's fraud theory to go to the jury.

In phase one, the jury found in favor of Banks and against GA on his claims for breach of oral contract and promissory fraud. The jury awarded Banks $6 million compensatory damages on the contract claim and $2.9 million compensatory damages on the fraud claim. The jury also found GA acted with malice, oppression, or fraud. On GA's cross-complaint, the jury found Banks and TetraVue did not misappropriate GA's trade secrets, take GA's property without consent, or otherwise harm GA by breaching an employee nondisclosure agreement.

In phase two, the jury awarded an additional $5.8 million in punitive damages against GA on the fraud claim. In phase three, the trial court denied Banks's requests for equitable relief. The court also granted GA's postverdict request that Banks be required to elect between his tort and contract remedies. Banks elected to have judgment entered on the fraud claim.

After the court entered judgment against GA on the fraud claim in the amount of $2.9 million compensatory damages and $5.8 million punitive damages, GA moved for judgment notwithstanding the verdict and a new trial. The court denied the motion for

13

judgment notwithstanding the verdict but conditionally granted a new trial subject to Banks filing a written consent to decrease the punitive damages award by $2.9 million.

After Banks filed a written consent to the remittitur of punitive damages, the court denied GA's motion for new trial and entered a new judgment against GA for $2.9 million in compensatory damages and $2.9 million in punitive damages.

GA filed a timely notice of appeal. Banks and TetraVue filed a timely notice of cross-appeal.

DISCUSSION

I. *BANKS'S LABOR CODE SECTION 970 CLAIM*

GA contends that because the trial court summarily adjudicated Banks's Labor Code section 970 claim against him, that prior adjudication was binding at trial and should have precluded Banks from presenting his common law promissory fraud claim to the jury because the statutory and common law fraud claims arose from the same "primary right." Banks cross-appeals, arguing the trial court erred by summarily adjudicating his Labor Code section 970 claim in the first instance because he opposed the motion with sufficient evidence to raise a triable issue of fact regarding GA's fraudulent intent. We conclude the trial court erred by summarily adjudicating Banks's Labor Code section 970 claim, thus obviating our need to address GA's related challenge.

A. *Standard of Review*

We review de novo a trial court's grant of summary adjudication. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860; Code Civ. Proc., § 437c, subd. (f)(2); *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1290.) We conduct our

14

review "on the basis of the papers filed at the time the court considered the motion, not in the light of documents filed subsequent to the trial court's resolution of the issue." (*Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 627.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

B. *Analysis*

Banks asserts the trial court erred by applying an incorrect legal standard when it summarily adjudicated his Labor Code section 970 claim against him. The trial court gave the following explanation for its ruling:

> "Banks moved to San Diego in 2000, based in part, he says, on the promise he would have an ownership/equity interest in Photonics as compensation. To recover on his Labor Code [section] 970 claim, Banks must prove General Atomics was deceiving him before he agreed to move.
>
> "*Giving Banks*'[*s*] *evidence and argument the benefit of all supported inferences*, he has not rebutted General Atomics' evidence nor shown a disputed issue of material fact regarding its intent at the time. Banks'[s] evidence that General Atomics deceived him later does not support a conclusion General Atomics deceived him from the outset, and *Banks has no direct evidence of an earlier scheme*." (Italics added.)

Banks contends the last italicized portion of the quoted passage demonstrates the trial court erroneously required Banks to establish GA's fraudulent intent via "direct evidence," whereas established law undeniably allows him to establish it via circumstantial evidence. (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30-31 (*Tenzer*) ["To be sure, fraudulent intent must often be established by circumstantial evidence"].)

15

Banks bolsters his argument by citing the trial court's comments during the summary judgment hearing, wherein Judge Oberholtzer observed that most fraudulent schemes "are proved, frankly, by e-mails or writings, that somebody carelessly left behind. That's the reality of it." GA counters that the portion of the trial court's ruling italicized at the beginning of the passage, together with other comments the trial court made during the hearing,[5] demonstrate the trial court did not limit Banks to proving GA's intent strictly with direct evidence. Although the trial court appears to have emphasized the value of direct evidence, we are satisfied the trial court understood Banks was not limited to using direct evidence to establish GA's fraudulent intent. Thus, we turn to the trial court's conclusion that Banks's circumstantial evidence was insufficient to raise a triable issue of fact regarding GA's intent.

But before we address the specific circumstantial evidence from which Banks argues GA's intent can be inferred, we address the parties' dispute about what evidence we may consider. GA contends Banks is now improperly relying on evidence that was not before the trial court at summary judgment but, rather, was first introduced at trial. GA further contends Banks failed to include in the appellate record the relevant summary judgment papers that were before the trial court. Banks responds that the trial evidence on which he now relies is undisputed and is the same as that which was before the trial

---

[5]     For example, when addressing Banks's common law fraud claim, Judge Oberholtzer stated: "[I]f I can draw two inferences from a given set of facts, in a motion for summary judgment, I'm supposed to rely on the one favoring the [nonmoving] party," and "[M]y obligation is to take all . . . permissible inferences that arise from the evidence. And if one of them favors summary judgment and one of them favors denying summary judgment, I'm to take the one that says denies."

court on summary judgment. To remove any doubt, Banks moves to augment the appellate record with certain of the evidence he lodged in opposition to GA's summary judgment motion. We grant Banks's motion to augment the record because there is no dispute that the relevant materials were before the trial court on summary judgment. (*Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1672-1673 (*Boeken*).) We deny GA's request to further brief those materials because the factual matters we discuss below are undisputed on appeal.

Banks argued to the trial court that his Labor Code section 970 claim should survive summary judgment because GA's fraudulent intent could be inferred largely from two historical facts: (1) the Blue family's sole and private ownership of GA and creation of Photonics as a division of GA incapable of issuing equity; and (2) the inclusion in GA's offer letter of a clause purporting to disavow reliance on any statements not contained in the letter, when the letter did not reference equity or ownership, Banks was reassured equity was nonetheless a component of his compensation, and GA subsequently sought to use the offer letter's disclaimer as a basis for denying Banks's claim for equity.

Banks asserts these facts are consistent with our Supreme Court's acknowledgment in *Tenzer* that "fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." (*Tenzer*, *supra*, 39 Cal.3d at p. 30.) We agree. A jury could reasonably have inferred from the private ownership of GA and organizational structure of its Photonics division that GA never

17

intended to grant Banks an ownership interest in Photonics. A jury could also reasonably have made the same inference based on GA's conduct regarding the disclaimer in Banks's offer letter. For example, if the offer letter could not include the specific terms of Banks's ownership interest because GA was still working out the mechanics of it, the letter could have referenced a grant of an ownership interest on terms to be determined. As Banks argued to the trial court, the jury could have inferred GA was attempting to pull a "gotch-ya [*sic*]." The inferences that can permissibly be drawn from the cited circumstances distinguish this case from the admonition in *Tenzer* that "if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury." (*Id.* at p. 31.) We therefore conclude the trial court erred by summarily adjudicating Banks's Labor Code section 970 claim against him. (See, e.g., *ibid.*; *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 368 [reversing grant of summary judgment for the defendant because the trial court erred by finding a jury could not infer fraudulent intent based on the defendant's contrary statements two years after making the alleged false promise].)[6]

Though we need not reach the issue based on our conclusion above, we note the trial court's order granting summary adjudication did not "specify the reasons for its determination" in granting GA's motion for summary adjudication with specific reference to the applicable supporting and opposing evidence, as required by Code of Civil

6    Evidence of GA's later misrepresentations, which were before the trial court in connection with GA's motion for summary adjudication of Banks's promissory fraud claim (discussed *post*), further allows a jury to infer that GA's earlier misrepresentations were false when GA made them.

18

Procedure section 437c, subdivision (g).[7]  Although the trial court's order refers generally to "Banks'[s] evidence" and "General Atomics' evidence," the order never identifies the specific evidence to which it is referring.  These vague references do not facilitate "meaningful appellate review."  (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448.)

## II.  *BANKS'S PROMISSORY FRAUD CLAIM*

GA challenges generally the sufficiency of the evidence supporting the jury's verdict on Banks's promissory fraud claim.  GA also specifically challenges the trial court's admission of Banks's lay opinion regarding the present value of his future employment benefits.

### A.  *Sufficiency of the Evidence, Generally*

"To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing."  (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 159; *Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1414 ["In a promissory fraud action, 'the *essence* of the fraud is the *existence of an intent at the time of the promise* not to perform it.' "].)  The jury

---

7    Code of Civil Procedure section 437c, subdivision (g) provides in pertinent part as follows:  "Upon the grant of a motion for summary judgment, on the ground that there is no triable issue of material fact, the court shall, by written or oral order, specify the reasons for its determination. The order shall specifically refer to the evidence proffered in support of, and if applicable in opposition to, the motion which indicates that no triable issue exists."

19

specifically found GA "ma[d]e a promise to Paul Banks regarding an ownership or 'equity' interest in the Photonics division that it did not perform" and that GA did not "intend to perform its promise when it made it."  GA contends there was insufficient evidence to support the jury's finding that GA did not intend to perform its promises when it made them.

" ' "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." ' "  (*Boeken*, *supra*¸ 127 Cal.App.4th at p. 1658.)  "The judgment is presumed to be correct," and "we presume that the record contains evidence to sustain every finding of fact."  (*Ibid.*)  " 'In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in to uphold the [finding] if possible. . . .  When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' "  (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)  "We do not reweigh evidence or assess the credibility of witnesses on review for substantial evidence."  (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.)

GA and Banks each base their arguments on different language found in *Tenzer*, *supra*, 39 Cal.3d 18.  GA seizes on the admonition that "if [a] plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will

20

never reach a jury." (*Id*. at p. 31.) Banks relies on *Tenzer*'s recognition that "fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform. (Prosser, [Torts (5th ed. 1984) § 109] at pp. 764-765.)" (*Id.* at p. 30.) In light of GA's burden under the substantial evidence standard of review (*Boeken*, *supra*, 127 Cal.App.4th at p. 1658), Banks has the better argument because GA's challenge would have us disregard reasonable inferences that support the jury's verdict.

The jury heard testimony that Blue directed Campbell to tell Lawrence Livermore scientists that they would receive equity or ownership in Photonics. Campbell told the jury Blue said the "focus was on [equity] and how we were going to use this to attract people from Livermore, particularly that were well-entrenched in their present positions. This is the thing that would be different from their present employment that would allow them an opportunity that they did not have." Perry similarly testified that in his early discussions with Blue, Baldwin, and Campbell, he was told that he "needed to use equity participation as a recruiting tool to get the core group of scientists down to" GA. Blue denied ever telling Campbell he could "give equity ownership to the Photonics division to anybody," explaining to the jury that "the Photonics unit was not a company, it was administrative units within the Energy Group," so "there was nothing to promise, for example. So yes, I didn't promise to give anything." True to his word, Blue testified that no one outside his family had owned any part of GA since 2000.

21

GA cites Banks's notes of a February 2000 meeting with Perry and certain slides from the Morgan Run presentation as proof that Banks would only receive equity in Photonics if that division were ultimately sold or went public.[8]  While that is certainly *one* reasonable inference, *another* reasonable inference is that the founders would immediately receive equity but its value may ultimately be affected by whether the division were sold or went public.  In other words, GA has not established that startup businesses only give their founders and employees equity at the moment they are sold or go public; the jury could reasonably have inferred the contrary, that startups grant equity at the outset with the expectation that its value will increase when the business is sold or goes public.[9]

GA argues that because it made good faith efforts at performing its promises—for example, by funding the division for several years and by preparing the Phantom Unit Plan and the Division Unit Plan—the jury could not have concluded GA had a fraudulent

---

[8]    Banks's notes read:  "will split off at some point—orig people getting 'founders shares.' "  His briefs omit the first clause.
    Banks testified the presentation slides addressed approximately eight companies that "were being used as examples of where start-up companies had been started where the employees, the founders got shares of the business and benefited from the success of the companies when they were sold or were going public."  Banks elaborated:  "So, essentially, the statements were that this was going to be a start-up, like these other companies that were being used, examples within General Atomics, and the principals [*sic*] and the work ethic and the culture and the participation by the employees was going to be the same as these example companies."

[9]    This also negates GA's suggestion that because Banks knew GA was privately owned he could not have reasonably relied on promises of equity in Photonics.  At oral argument, GA's counsel acknowledged that even if Photonics was never spun off or never went public, GA nevertheless could have granted the founders equity in GA itself.

22

intent at the time it promised equity to Banks. We are not persuaded. The jury could have inferred from the plans' express disavowals of any present equity interest that GA did not intend to grant Banks an equity interest in Photonics. We find distinguishable those cases GA cites for the proposition that good faith efforts to fulfill a promise negate a finding of fraudulent intent. In *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, it was undisputed that the insurance-company-defendant actually performed for several years its promise of allowing the insurance-agent-plaintiff to run his office the way he saw fit, intervening only after multiple years of disappointing sales. (*Id.* at p. 481.) Similarly, in *Ferreira v. Quik Stop Markets, Inc.* (1983) 141 Cal.App.3d 1023, 1032, there was evidence that the defendants had performed their promises, at least in part.[10] Here, by contrast, GA never actually performed its promise.

GA offers a number of legitimate excuses for why it never fulfilled its promise of equity to Banks. Those reasons, however, also lend themselves to inferences that support the jury's finding of fraudulent intent. For example, the jury could have viewed GA's explanation that it never granted Banks equity because Photonics never developed a successful *commercial* product as a repudiation of GA's promise to grant equity based on the success of *all* Photonics products. The jury could also have rejected GA's reliance on a dispute over Campbell's status as a founder as an excuse for not granting Banks his promised equity. GA does not explain why it could not have immediately fulfilled its

---

[10]     *Ferreira* is further distinguishable because the jury rejected the plaintiff's other fraud theories, finding "that defendants had made no misrepresentations, concealed no facts." (*Ferreira v. Quik Stop Markets, Inc.*, *supra*, 141 Cal.App.3d at p. 1032.)

23

commitment to Banks while later resolving the dispute as to Campbell's status. GA also cites enhanced bonuses as a symbol of its intent to make good on its commitment to Banks. But the jury also heard that GA could get reimbursed for the cost of bonus expenses under some government contracts, whereas the cost of granting equity could not similarly be passed along. The jury could infer from this that GA and the Blue family never intended to incur the unreimbursable cost of granting equity to Banks.

GA also cites passages from Banks's counsel's opening statement to the jury to suggest that GA formed its fraudulent intent "later in time," deciding " 'along the way that it was not going to honor the deal' even though it 'was getting the benefit of the deal from the labor, the intellectual labor of Paul Banks and the other founders.' " However, the jury could have interpreted counsel's vague comments as referring to the time when Banks was working for both Lawrence Livermore and GA and had not yet definitively left Lawrence Livermore.

Finally, the inferences we discussed *ante* in support of Banks's Labor Code section 970 claim further support the jury's finding of promissory fraud.

In short, the record contains substantial evidence from which the jury could reasonably infer that GA's promises to Banks regarding equity or ownership in Photonics were knowingly false when GA made them.

B. *Banks's Lay Opinion Regarding the Present Value of His Future Employment Benefits*

GA contends the trial court erred by allowing Banks to testify about his calculation of his fraud damages, which he based on the present value of the difference

24

between the employment benefits he would have received had he stayed at Lawrence Livermore compared with what he would have received at GA. GA contends the trial court abused its discretion by allowing Banks to offer this testimony because it constituted impermissible expert testimony by a lay witness. GA further contends that even if the trial court did not err by allowing the testimony, the testimony was nonetheless insufficient to support the fraud award because it was based on speculation and unsupported factual assumptions. We disagree in both respects.

1. *Admissibility of Banks's lay opinion*

Banks acknowledged at trial that he is not an expert in performing long-term cash-flow projections and discounting them to present value. Therefore, the admissibility of his opinion is governed by Evidence Code section 800, which "limits lay opinion testimony to an opinion that is '(a) Rationally based on the perception of the witness; and (b) Helpful to a clear understanding of his testimony.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1306, quoting Evid. Code, § 800.) "A witness who is not testifying as an expert may testify in the form of an opinion only if the opinion is based on his own perception." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (2009 ed.) foll. § 800, p. 3.) In this context, "perception" means the process of "acquir[ing] knowledge through one's senses" (Evid. Code, § 170); that is, "by personal observation." (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1306.) "[W]hen a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible." (*Id.* at p. 1308.) Common examples of admissible lay opinion include "testimony that another person was intoxicated [citation] or angry [citation] or driving a

25

motor vehicle at an excessive speed [citation] . . . ."  (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)  More pertinent here, however, are opinions by "a nonexpert witness . . . as to the value of his property or the value of his own services."  (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code  (2009 ed.) foll. § 800, p. 3; *Burke v. City and County of San Francisco* (1952) 111 Cal.App.2d 314, 318  (*Burke*) ["A plaintiff may testify as to the value of her own services as bookkeeper, saleswoman, and clerk."]; Evid. Code, § 813, subd. (a) ["The value of property may be shown only by the opinions of any of the following:  [¶] . . . [¶] (2) The owner or the spouse of the owner of the property or property interest being valued."].)

"The decision whether to permit lay opinion rests in the sound discretion of the trial court."  (*People v. Bradley* (2012) 208 Cal.App.4th 64, 83.)  Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' "  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)  The standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts."  (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

Banks testified that if he had not been induced to leave Lawrence Livermore, he would have earned between approximately $2.8 million and $3 million more there than at GA.[11]  As foundation, Banks testified regarding his compensation history over

---

[11]     Banks testified the amount varied based on the amount he would have been required to contribute to the Lawrence Livermore pension program and his selected retirement age.

approximately 10 years working at Lawrence Livermore. He described receiving base compensation, cost-of-living increases, and discretionary bonuses; fringe benefits (e.g., medical coverage, vacation and sick leave, life insurance, and a survivor death benefit); a 403(b) retirement plan he was required to contribute toward; and the University of California Retirement Plan (UCRP), a pension program in which he would have vested after another year and a half at Lawrence Livermore.[12] Banks testified this information was documented in pay stubs, open enrollment, and retirement plan documents that were distributed periodically while he was employed at Lawrence Livermore.

Banks also testified regarding the compensation and fringe benefits he received during the approximately eight years he was employed at GA, including the bonuses and matching retirement plan contributions he received.

Banks explained how he used his salary history to project what his salary would have been at retirement at each of Lawrence Livermore and GA. He performed calculations assuming retirement at ages 60 and 65 and living until age 85 (based on his relatives' ages).[13] Banks discounted his comparison results to present value using a 2 percent discount rate based on his understanding of inflation. Banks testified he did not require assistance from anyone at Lawrence Livermore, GA, or "any kind of expert" to

[12]    Banks acknowledged that although the UCRP initially required no employee contribution, the plan began requiring employees to contribute 2 percent of their salary in 2010 and would increase the required contribution to 5 percent in 2012. Banks testified he took these contributions into account in performing his comparison.

[13]    Banks explained his selection of 85 as "an average life span of an individual male, my parents' parents, how long they lived. And they lived into their late 80's, early 90's and then I chose 85."

27

assist with his calculation, the mechanics of which he performed using Microsoft's Excel software, which Banks testified he had used "constantly" in his work.

GA's counsel cross-examined Banks on his damages testimony. About one week later, GA called its own damages expert, Brian Bergmark, who testified he had conducted thousands of analyses valuing alternate income projections. Bergmark testified he had "all of the information [he] felt [he] needed"—Banks's testimony, spreadsheets, other exhibits, and input from someone in Lawrence Livermore's benefits department. Bergmark did not challenge Banks's overall methodology and conceded the present-value discounting in this case is "easier" than in some others, but took issue with certain of the components Banks used. "The most significant" area of disagreement was over Banks's use of a 2 percent discount rate. Bergmark thought Banks should have used a "more appropriate" 4.5 percent discount rate, which would have reduced Banks's damages to $1 million (assuming the remainder of Banks's calculations were correct). Bergmark also testified Banks failed to take into account the bonuses and 401(k) matching he received at GA.

The trial court gave the jury the following instruction, CACI No. 223, regarding Banks's lay opinion testimony:

> "Witnesses who were not testifying as experts may have given an opinion during the trial. You may, but are not required to, accept that opinion. You may give the opinion whatever weight you think is appropriate.
>
> "Consider the extent of the witness's opportunity to perceive the matters on which the opinion is based, the reasons the witness gave for the opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether

28

information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

Under the circumstances presented here, we conclude the trial court did not abuse its discretion by admitting Banks's testimony regarding his damages. Banks established his compensation history based on his own perceptions, based his future projections of the value of his services on those perceptions, and used software to perform a mechanical computation—all subject to cross-examination and challenge by an opposing expert witness. (*Burke*, *supra*, 111 Cal.App.2d at p. 320 ["a fair latitude upon cross-examination" ensures "the facts are certain to be adduced"]; *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112 [same].) Banks based his selection of a 2 percent discount rate on his understanding of inflation. Although GA argues "a 'riskless' discount rate 'as low as two percent' is inappropriate where future earnings are 'not certain,' " citing *Douglass v. Hustler Magazine, Inc.* (7th Cir. 1985) 769 F.2d 1128, 1143 (*Douglass*), Banks presented abundant evidence of the stability of employment at Lawrence Livermore.[14] Bergmark testified Banks's selection of a 2 percent discount rate "makes

---

[14]     In addition to Campbell's testimony that employment at Lawrence Livermore "was essentially a life employment if you chose to do it," Banks testified he was aware of many career staff scientists there. Banks also testified that several of his contemporaries remained employed at Lawrence Livermore well beyond the date on which Banks would have vested in the UCRP. In contrast to this evidence of stability and certainty, the plaintiff in *Douglass* sought to recover lost earnings from modeling jobs she contended she lost as a result of a " 'provocative' magazine[']s" publication of photographs of her in various states of undress. (*Douglass*, *supra*, 769 F.2d at pp. 1134, 1143.) The court acknowledged a 2 percent discount rate could be appropriate when an income stream is certain, but concluded this rate was inappropriate for the "highly uncertain . . . field of entertainment." (*Id*. at p. 1143; see *Ramirez v. New York City Off-Track Betting Corp.*

29

sense right now in the current environment that we're in.  There's not a lot of money being made on investments.  There's certainly not a lot in a savings account.  Even if you put it into a government security or a treasury bill, you may only make two percent or two and a half percent or somewhere along those lines."  Over a 50-year time period, however, Bergmark opined 4.5 percent was a more appropriate discount rate.  Under the facts presented here, GA's challenges to Banks's testimony go more to its weight than to its admissibility (*People v. Medina* (1990) 51 Cal. 3d 870, 887), as the trial court properly instructed the jury.

The cases GA cites do not persuade us otherwise.  The California cases GA cites for the proposition that expert testimony is required to establish a discount rate or to value a pension are all distinguishable because none of them specifically address the admissibility of lay opinion testimony to establish either point.  In *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, both parties presented expert testimony on the present value of a pension plan.  (*Id*. at p. 749, fn. 4.)  *Nguyen v. Los Angeles County Harbor/UCLA Medical Center* (1995) 40 Cal.App.4th 1433 discussed whether to use the "present value" or "cost" approach to valuing an annuity for purposes of determining attorney fees under MICRA (California's Medical Injury Compensation Reform Act).  Although in doing so the court stated "the discount rate and the plaintiff's life expectancy . . . call for expert testimony," the court never addressed the admissibility of

(2d Cir. 1997) 112 F.3d 38, 41 ["Where . . . the parties have adduced no evidence relating to the discount rate, and have made no showing that the undiscounted lost wages figure has been adjusted upward to cover future inflation, we have suggested a discount rate of 2% per year."].)  By all appearances, steady employment at Lawrence Livermore is far more certain than in the field of entertainment.

lay opinion on those topics because that issue was not before the court.  (*Id*. at p. 1450.)  In *Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, the court noted "[t]estimony by actuaries is *frequently* used to show discount rates and the present value of future benefits" (*id.* at p. 243, italics added), implying expert testimony is not *always* required to do so.  In any event, the cited passage is dicta because there was expert testimony regarding the discount rate.  (*Ibid*.)

*Schleier v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.* (D.C. Cir. 1989) 876 F.2d 174 (*Schleier*) is also distinguishable.  Although the court concluded the jury "needed expert guidance" to "discount lost future wages to their present value" (*id*. at p. 179), the court made that statement in the context of a complete dearth of guidance on the topic:  "Although the [trial] judge twice gave the jury a pattern instruction explaining the concept of discounting to present value, the jury was not provided with any comprehensible guidance on how to discount to present value."  (*Ibid*.)  Here, by contrast, the jury was presented with two guides:  Banks's and Bergmark's.[15]

In short, we conclude the trial court did not abuse its discretion in allowing Banks to testify regarding his fraud damages.

---

[15]    Not only is *Schleier* factually distinguishable, it also undermines GA's position in another respect.  The defendant there challenged the lack of expert testimony regarding the plaintiff's past and present earnings "from which future earnings might be extrapolated."  (*Schleier, supra*, 876 F.2d at p. 178.)  As here, the record included lay witness testimony "as to [plaintiff's] work history, schooling, job and salary . . . .  In addition, there was testimony assessing his skill as an employee which suggested the likelihood of his being promoted."  (*Ibid*.)  When presented with such evidence, the court concluded "[e]xpert testimony is not required to show this aspect of lost future wages."  (*Id*. at pp. 178-179.)

2. *Sufficiency of evidence supporting the $2.9 million fraud judgment*

GA contends insufficient evidence established Banks's projected earnings, expected lifespan, and selection of a 2 percent discount rate. We are not persuaded.

As discussed above, Banks testified about his 18-year compensation history at Lawrence Livermore and GA and based his projections on those histories. This is the same type of lay opinion testimony held sufficient in *Schleier*, *supra*, 876 F.2d at page 178, discussed *ante* at footnote 15. GA's reliance on this court's opinion in *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685 is misplaced. In that case, we concluded an expert's testimony regarding the plaintiff's lost future income was too speculative because there was no evidence the plaintiff, an at-will employee, had a reasonable expectation of continued employment. Here, as discussed *ante*, the jury heard testimony that employment at Lawrence Livermore "was essentially a life employment if you chose to do it." Banks also testified he based his life expectancy on his relatives' lifespans, testimony to which GA did not object at trial.

GA again challenges Banks's use of a 2 percent discount rate. As discussed above, GA's expert Bergmark acknowledged Banks's selected discount rate "makes sense right now in the current environment that we're in," but countered that a higher rate would make sense over a longer period. The jury was properly instructed how to resolve this conflicting testimony. GA's reliance on this court's opinion in *Schiernbeck v. Haight* (1992) 7 Cal.App.4th 869 for the proposition that the inflation rate should not be used as a discount rate is misplaced because, as was the case in *Schleier*, *supra*, 876 F.2d at page 179, "the jury was not provided evidence *or* instructed on the present value calculation."

32

(*Schiernbeck. v. Haight*, *supra*, 7 Cal.App.4th at p. 877; *id.* at 876 ["There was also no *evidence* on how to determine the present value of future loss. . . . Neither party introduced any evidence of compounding or discounting factors, including how to calculate an appropriate rate of return throughout the relevant years."].) Here, however, the jury received competing testimony regarding discount rates and was instructed on discounting to present value.

In sum, we conclude substantial evidence supports the jury's award of $2.9 million in fraud damages.

### III. *BANKS'S ELECTION OF REMEDIES*

Banks contends the trial court erred by requiring him to elect between his fraud and contract remedies. He contends the remedies were not inconsistent and therefore the court should have simply allowed recovery on both theories and eliminated any duplicative damages. GA counters that Banks's theories of recovery are, in fact, inconsistent, and therefore the trial court correctly put Banks to an election.

"In its 'conventional form,' the doctrine of election of remedies 'is stated as follows: Where a person has two concurrent remedies to obtain relief *on the same state of facts,* and *these remedies are inconsistent,* he must choose or elect between them; and if he has clearly elected to proceed on one, he is bound by this election and cannot thereafter pursue the other. "Election of remedies has been defined to be the right to choose or the act of choosing between different actions or remedies where plaintiff has suffered *one species of wrong* from the act complained of. Broadly speaking, an election of remedies is the choice by a plaintiff to an action of one of two or more coexisting

33

remedial rights, where several such rights arise out of the same facts, but the term has been generally limited to a choice by a party between *inconsistent* remedial rights, the assertion of one being *necessarily repugnant to* or a *repudiation of* the other." ' " (*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1218, quoting 3 Witkin, Cal. Procedure (4th ed. 1997) Actions, § 174, pp. 243-244, italics in *Denevi*.) The doctrine applies "when the plaintiff seeks inconsistent remedies in causes of action based on the same set of facts." (*General Ins. Co. v. Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810, 828.)

The issue here, then, is whether Banks's fraud and contract recoveries arise from the same facts and are inconsistent with one another. We conclude they are. As the trial court explained, Banks

> "chose to associate each of his substantive legal theories with an independent—and inconsistent—approach to damages. In standard benefit-of-the-bargain form, Banks asserted that his damages for breach of contract were the value of the [2 ]percent interest he should have received. As to promissory fraud, Banks catalogued the value of his prior employment that he would have received had he not been fraudulently induced to leave [Lawrence Livermore]. The jury's verdict awarded both items of damage as requested on Banks'[s] two claims.

> "Structuring the argument in this fashion runs afoul of the rule against inconsistent damages theories. Banks'[s] first theory sought the benefits of the contract as damages, whereas the second requested a rescissory measure of damages to place Banks in the same position as he would have been in had the contract never existed. He may be entitled to choose which approach to utilize, but he cannot have both. That would, in effect, allow him to both have his cake and eat it too."

34

We find the trial court's reasoning persuasive. Banks's alternative damages theories contemplate two inconsistent universes that cannot coexist: one in which Banks never left Lawrence Livermore, and one in which he did. (*Paularena v. Superior Court of San Diego County* (1965) 231 Cal.App.2d 906, 915 ["Damages may not be recovered on the theory that the contract exists and additionally on the theory that the contract is at an end."].) Even an accomplished laser physicist like Banks cannot render these universes consistent.

Banks argues his fraud and contract claims are not inconsistent because "each action arose out of different obligations and different operative facts." (*Pat Rose Associates v. Coombe* (1990) 225 Cal.App.3d 9, 18 (*Pat Rose*), italics omitted.) Specifically, Banks argues his "fraud claim originated in GA's false promises beginning in 2000 and continuing thereafter," whereas his contract claim "was not fully formed until October of 2002, at the time Blue confirmed the material terms of that deal." But as the trial court correctly observed, "Each theory was based on the same alleged promise by GA: to provide Banks with a [2 ]percent interest in GA's Photonics division that he was to help in establishing." Although GA's promises may only have become specific enough to constitute an enforceable contract in 2002—an issue we need not decide in light of our other determinations—those later promises were, in essence, merely reiterations of the same promises of equity GA made in 2000. As the trial court observed:

> "[O]n the facts of this case GA's false promise and its breach of the contract are inextricably intertwined. Had GA provided Banks with his [2] percent interest in the Photonics unit after 2002, there could have been no false-promise claim based on the events of 2000. The promise would not have been false. Accordingly, if Banks elects to

35

measure his damages by the value of his [2 ]percent interest, he cannot also recover benefits he would have received had he remained employed at Lawrence Livermore."

We, of course, agree with the general principle that claims for fraud and breach of contract can peacefully coexist without requiring an election, as occurred in the cases Banks cites. But those cases are factually distinguishable. In *Pat Rose*, for example, the plaintiff's contract and fraud claims "arose out of different obligations and different operative facts" because the contract claim was based on breach of a lease by nonpayment of rent whereas the fraud claim was based on fraudulently inducing the plaintiff to purchase a hotel via misrepresentations about performing under the lease (admittedly the same subject matter as the contract claim) *as well as additional, unrelated misrepresentations* about obtaining a franchise in a national hotel chain, the operators' net worth, and the hotel's operating income. (*Pat Rose*, *supra*, 225 Cal.App.3d at p. 14.) *Baker v. Superior Court* (1983) 150 Cal.App.3d 140 and *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101 are distinguishable because they addressed whether a plaintiff who had obtained a prejudgment writ of attachment on a breach of contract claim was thereafter barred from recovering damages for fraud in the inducement of the contract. (*Baker*, *supra*, 150 Cal.App.3d at pp. 145-146; *Glendale, supra,* 66 Cal.App.3d at p. 137.) *Baker* and *Glendale* are further distinguishable in that neither case involved a plaintiff seeking inconsistent remedies based on the same facts. (*Baker, supra,* 150 Cal.App.3d at p. 145 [acknowledging the "limitation" against "seek[ing] inconsistent remedies in causes of action based on the same facts"]; *Glendale, supra,* 66 Cal.App.3d at p. 137 ["The contract cause of action

36

was for breach of the agreement guaranteeing completion of the Window Hill improvements whereas the fraud cause of action was based on the false promise on behalf of Marina View that the loan funds would be expended solely for the Window Hill offsites. Thus, each cause of action arose out of different obligations and different operative facts."].) Banks has not cited any case that allowed a plaintiff to pursue *through judgment* inconsistent fraud and contract claims that arose from the same facts, as his do.

Banks argues the trial court was truly concerned with the concepts of "duplicative compensation" and "double recovery"—which would not have required an election of remedies but merely a reduction of overlapping damages—but erroneously chose election as the mechanism for addressing that concern. We disagree. Although the trial court acknowledged "[r]ecovering the same compensation twice" as one aspect of the "rule against double recovery," the court stated that "is not an issue here." Rather, the trial court properly focused on the "corollary principle . . . precluding the recovery of *inconsistent* damages." This was the relevant legal principle.

Banks argues that even if his fraud and contract claims were somehow inconsistent, the trial court should not have required an election of remedies absent substantial prejudice to GA. GA counters that Banks forfeited this issue by not raising it before the trial court. Banks does not address this in his reply brief. Accordingly, we deem the argument forfeited. (See, e.g., *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1398-1399 [" ' "[I]t is fundamental that a reviewing court will

37

ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court." ' "].)

In short, because Banks's fraud and contract claims pursued inconsistent remedies based on the same facts, the trial court did not err in requiring Banks to elect between them at judgment.

## IV. *REMITTITUR OF BANKS'S PUNITIVE DAMAGES AWARD*

Banks contends the trial court erred by conditionally granting GA's motion for new trial on the basis of excessive punitive damages unless Banks consented to remittitur of his punitive damages award. He argues the trial court applied an incorrect legal standard and asks us to review the ruling de novo. Banks misstates the standard of review.

"When a trial court grants a new trial for excessive damages, either conditionally or outright, a presumption of correctness attaches to the order and it will not be reversed unless it plainly appears that the judge abused his discretion." (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 822 (*Grimshaw*).) In these circumstances, "the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932.) In ruling on such a motion, the trial court is "vested with authority to disbelieve witnesses and reweigh the evidence . . . and the appellate court will reverse only if a manifest and unmistakable abuse of discretion is shown." (*Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 345.) This is because "the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of

38

fact."  (*Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 882; Code Civ. Proc. § 662.5, subd. (a)(2) [authorizing trial court to conditionally grant a new trial "unless the party in whose favor the verdict has been rendered consents to the reduction of so much thereof as *the court in its independent judgment* determines from the evidence to be fair and reasonable", italics added].)  Based on his misstatement of the standard of review, Banks reargues the facts supporting the jury's $5.9 million punitive damages award, not those supporting the trial court's reduction.  Focusing on the latter, the trial court's reduction of punitive damages was not an abuse of discretion.

In considering the reprehensibility of GA's conduct, we must consider whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419 (*Campbell*); *Jet Source Charter, Inc. v. Doherty* (2007) 148 Cal.App.4th 1, 11 [under de novo review, this court reduced jury's award of punitive damages to correspond to amount of "substantial" compensatory damages even though "defendants' fraudulent scheme, repeated over a number of transactions, 'merits no praise' "].)  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."  (*Jet Source*, at pp. 8-9.)  Here, only one of the indicia is present:  "intentional malice, trickery, or deceit."  Arguably, a second criteria—whether "the conduct involved repeated actions

39

or was an isolated incident"—may also be present because GA made repeated misrepresentations to Banks about equity in Photonics. But we do not find this factor compelling because all the misrepresentations were confined to a single topic. And none of the other indicia are present: Banks suffered only economic damages, GA did not jeopardize his health or safety, and Banks was not particularly financially vulnerable in light of his six-figure income. Although we conclude GA's use of deceit (and arguably GA's repetition of that deception) justifies *some* award of punitive damages, they are not so compelling as to render the trial court's reduction of punitive damages an abuse of discretion.

The substantial award of compensatory damages here also supports the trial court's reduction of punitive damages. (*Campbell*, *supra*, 538 U.S. at p. 425 ["When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."].) As GA observes, the $2.9 million compensatory damage award is nearly three times the amount Banks's own expert testified Banks's 2 percent interest in Photonics was worth. Banks repeatedly argues the trial court erred because it "appeared to be acting under the compulsion that a punitive damages award that exceeded a 1-to-1 ratio with compensatory damages was somehow impermissible." The record does not support this argument. On the contrary, the trial court acknowledged Banks's assertion that "there is no hard-and-fast rule as to ratios requiring the Court to find that the award in this case is excessive." Further, the court noted it was "require[d] . . . to consider the reprehensibility of the defendant's conduct, the ratio between the compensatory and punitive awards, and

40

the defendant's ability to pay."  The trial court confirmed its determination was based on "the circumstances of the case" and not on any bright-line rule regarding ratios.  Thus, the record makes clear that the trial court "did not base its decision solely on the ratio of punitive to compensatory."  (*Grimshaw*, *supra*, 119 Cal.App.3d at p. 821 [rejecting a similar claim].)

In analogizing to comparable civil penalties (*Campbell*, *supra*, 538 U.S. at p. 428), Banks asserts Labor Code sections 970 and 972 are "the closest statutory analog" and contends "section 972's penalty of double damages contemplates the precise 2-to-1 ratio of punitive to compensatory damages the jury originally awarded."  While we agree with Banks that the Labor Code offers an appropriate analogy, we do not agree with his math.  A two-to-one ratio is equivalent to *triple* damages, not double damages.  That is, awarding $2.9 million in compensatory and $5.8 million in punitive damages amounts to $8.7 million, or three times the amount of the original $2.9 million compensatory damages award.  The trial court's reduction of punitive damages here brought that award within the one-to-one ratio—or doubling—allowed under the analogous Labor Code claim.

Banks argues the trial court's reduced punitive damage award fails to sufficiently punish and deter GA.  "[P]unitive damage awards are generally not allowed to exceed 10 percent of the defendant's net worth, and . . . significantly lower percentages are indeed the norm."  (*Storage Services v.Oosterbaan* (1989) 214 Cal.App.3d 498, 515; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596.)  Banks and the trial court acknowledged the jury's $5.8 million punitive damage award was approximately 15 percent of GA's net

41

worth. As a function of math, the reduced $2.9 million award is approximately 7.5 percent of GA's net worth. Although Banks argues GA's net worth is "subject to GA's considerable manipulation," under the appropriate standard of review the trial court was not required to accept Banks's argument.

Finally, Banks challenges the sufficiency of the trial court's order granting GA's new trial motion, contending it does not "satisfy the rigors of Code of Civil Procedure section 657 in all respects." We are not persuaded. "When a motion for new trial is granted for excessive damages the specification of reasons should indicate the respects in which the evidence dictated a smaller verdict but, as the court observed in [*Neal v. Farmers Ins. Exchange*, *supra*, 21 Cal.3d 910)], different considerations bear upon the adequacy of the reasons where the amount of punitive rather than compensatory damages is the primary concern." (*Grimshaw*, *supra*, 119 Cal.App.3d at p. 822.) "In such cases the specification is adequate if it reveals how the court applied the decisional guidelines for assessing the propriety of the amount of the punitive damage award to the evidence in the particular case." (*Ibid.*) That standard is met here. The trial court's order discusses the substantial nature of the compensatory damage award, the fact that it included only economic damages, and the fact that it approximated 15 percent of GA's net worth in contravention of the general guideline that punitive damage awards not exceed 10 percent. The trial court's order adequately specified the bases for the court's ruling.

In sum, the trial court did not abuse its discretion by conditionally granting GA's motion for new trial on the basis of excessive damages unless Banks consented to remittitur of his punitive damages award from $5.8 million to $2.9 million.

42

DISPOSITION

The judgment is reversed to the extent it is based on the superior court's order granting GA's motion for summary adjudication of Banks's Labor Code section 970 claim. The order granting summary adjudication as to that claim is vacated and the superior court is directed to enter an order denying summary adjudication as to that claim. The judgment is affirmed in all other respects. Banks is entitled to his costs on appeal.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

43